6 N.J. Super. 90 (1950)
70 A.2d 182
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
NATHAN PINSKY AND ANOTHER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 1949.
Decided January 4, 1950.
*92 Before Judges JACOBS, DONGES and BIGELOW.
Mr. Charles V. Webb, Jr., argued the cause for plaintiff-respondent (Mr. Duane E. Minard, Jr., Essex County Prosecutor) (Mr. C. William Caruso, Legal Assistant Prosecutor, of counsel).
Mr. Samuel I. Kessler argued the cause for defendants-appellants (Mr. Max L. Rosenstein, attorney).
The opinion of the court was delivered by BIGELOW, J.A.D.
Pinsky and Schrier appeal from a conviction for bookmaking contrary to the provisions of R.S. 2:135-3. There is no dispute as to the facts from which the jury inferred guilt. Pinsky, in his testimony, offered an explanation of the facts but obviously the jury disbelieved him. Schrier did not testify.
Detective Schultz and two other police officers, on October 28, 1948, at 2:35 P.M., went to a grocery store on Walnut Street, Newark, and into a small room in back of the store where they found Pinsky talking over a telephone and Schrier seated at a table beside him. In the room was a radio, tuned to a station that broadcast racing news every half hour; and on the table a National Racing Program, a Daily Sports Bulletin, a paper captioned Alphabetical Index at Major Tracks, all dated October 28, 1948, and some memoranda that were the most important exhibits in the case: First, three or four dozen ruled sheets about 6 inches square, with the date October 28, 1948, stamped at the top. Each sheet had a name or identifying *93 symbol written under the date, for instance, "Dave 27," "Morris B." or "23A." Below were such annotations as these: "1 NY 15 Ann Franbee." Detective Schultz gave his opinion as an expert that the papers, telephone and radio constituted the equipment of a bookmaking office. He interpreted the sheets to indicate that certain persons, identified only as "Dave 27" or "Morris B." had bet with Pinsky and Schrier certain sums on certain horses. "1 NY" meant the first race at the Empire Track on the outskirts of New York; Ann Franbee was the horse, and $15 the amount of the bet. Then there were a score of smaller sheets from a pad, 3 by 5 inches, bearing various dates from September 12th to October 27th, on each of which were written 15 or so items reading, for instance, "Dave 27 C 40" or "Bob St. P 52.80." A "C" or a "P" appeared after each name. Some of the names are identical with those at the top of the larger sheets; others do not appear on the larger sheets. Detective Schultz expressed the opinion that the small memoranda showed the results of the betting on earlier dates: That Dave 27 had lost $40, and that the letter "C" meant that the defendants were to collect that sum from him. "P" meant that they must pay; Bob St. had won $52.80.
Pinsky testified that he was "a tipster or a turf counsellor;" that this was a rather common business connected with horse racing. The larger sheets indicated that clients who had received his advice over the telephone on the 28th, had told him that they were going to bet (but not with Pinsky) the amount set down on a horse that Pinsky recommended. If his client won, Pinsky was entitled to a 10 per cent. commission of the winnings. All these sheets, he testified, were in his handwriting or Schrier's. Questioned about the smaller sheets, he said that the line reading "Dave 27 C 40" meant that Dave 27, a customer of his, owed him $40 as his commission. His attention was called to the letter P in the line "Bob St. P 52.80," and he was asked,
"That indicates a payment to Bob in the sum of $52.80, doesn't it? Well, the P don't mean paid.
"What does it mean? I put my initials there. * * *
*94 "Some of them have P in front of them, some have C in front of them, do they? That's right.
"What does the C mean? The C means that they owe me that much money.
"You are to collect that much? That's right.
"What does the P mean? Well, I used to put my initials in front of a lot of these things."
Pinsky testified that he did not know the full name of anyone indicated on any of the sheets, or where they lived, or what their telephone numbers were.
The appellants objected to the reception in evidence of the papers seized at the time of the arrest, on the ground that the police had no search warrant. Since it does not appear that the arrest was unlawful, no search warrant was required to make legal the seizure of the evidence. State v. MacQueen, 69 N.J.L. 522 (Sup. Ct. 1903); 6 C.J.S., Arrest, § 17. And even if the papers were unlawfully seized, they were still admissible in evidence. State v. Lyons, 99 N.J.L. 301 (E. & A. 1923). Appellants argue that documents unlawfully taken are not admissible unless "evidential per se," which they understand to mean that they are not admissible if their materiality is not self-evident, but must be established by explanatory testimony. This is not the meaning of the expression "evidential per se" used in State v. Lyons and some of our other cases. That expression means no more than that the papers are material and competent, when we leave out of consideration the manner in which the State obtained the papers.
The defendants produced as a witness Mr. William Ratner, a newspaper man, expert in racing activities, in order to prove that the business of tipster was a common business and that in certain respects Pinsky's activities, as described by him, were normal for one engaged in that business. The Prosecutor interposed a great many objections which were sustained by the Court. Three of the rulings will fully illustrate the entire group. The Court refused to permit Ratner to testify whether he knew of people who are engaged in the business of giving information in connection with races. The ruling was not harmful, because it clearly appeared from *95 Ratner's evidence as a whole that he did know of people so engaged, and Detective Schultz had testified that many men were engaged in the business, receiving "a certain percentage of the winnings." Objection was sustained to the questions, "Are you familiar with the usual commissions or percentages that they receive for giving out this information? What is the usual commission that a person receives for giving information?" We think the Court should have permitted the questions to be answered, but since there is no intimation anywhere in the case that the 10 per cent. commission mentioned by Pinsky was unusual, we do not see how the defendants were injured.
The Court sustained the State's objection to this question: "Is it unusual, Mr. Ratner, for men engaged in this business to give two or three alternative selections?" One of the memoranda sheets which the State had put in evidence showed, as explained by Pinsky, that for the first race at New York on October 28th, he recommended Trifle to one customer, Ann Franbee to another, and Blue Gold to a third. He was asked:
"How many winners did you have? You pick two or three.
"You mean you would give one winner to one fellow and another winner to another fellow, is that what you did? Well, I gave them two or three that had the possibilities to win.
"If anyone won you would win? Yes, sir."
By recommending several horses, he increased the likelihood of his picking the winner and getting a commission, although he cut down the possibility of earning as much as he might have if he had recommended only one horse and that one had come in first. We do not perceive that the appellants were prejudiced by the exclusion of testimony that this practice was not unusual. Our statute provides in cases where the entire record of the trial is brought before the Appellate Court, that no judgment shall be reversed "for any error except such as shall or may have prejudiced the defendant in maintaining his defense upon the merits." R.S. 2:195-16, as amended P.L. 1943, c. 43. This provision is repealed in P.L. 1946, c. 187, § 8, and is copied into Rule *96 1:2-19; but in the rule the word "may" is omitted from the quoted clause. Whether the omission works a change in our law, we need not determine, for we are satisfied that the defendants were not prejudiced by the errors mentioned and therefore no basis for reversal is afforded by them. State v. Fuersten, 103 N.J.L. 383, 389 (E. & A. 1927).
Appellants argue that the refusal of the Court to charge certain requests should lead to a reversal. The Court, however, while not using the phraseology proposed by counsel, did correctly charge the law on all subjects that were included in the requests.
The Court, in the course of charging the jury, told them that he was about to comment on Pinsky's testimony "in a way which the Court does not ordinarily do, * * * and the Court indicates now to the jury under the reservations I have already stated as to the jury's prerogatives in this case, that in the Court's opinion that testimony is unbelievable." The Court also strongly emphasized, both at the beginning and end of his charge, that "the jury are the final judges of the facts, uncontrolled by any comments of the Court," he told them that they were the ones to judge of the credibility of witnesses. And with explicit reference to his opinion of Pinsky's testimony, he charged, "Under the law it is your duty not to be bound by the Court's opinion, but to disregard all such expressions of the Court, if you see fit so to do." The portion of the charge of which Pinsky complains was fair comment on the evidence and was not an abuse of the Court's discretion. Pinsky's attempted explanation of the admitted facts seems to us incredible. There is here no ground for reversal. State v. Hauptmann, 115 N.J.L. 412 (E. & A. 1935).
Lastly, the appellants contend that the verdict was against the weight of the evidence. We do not so find it. The judgment will be affirmed.