17 N.J. Super. 446 (1952)
86 A.2d 259
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RALPH CARBONE AND LORETTA FRANZE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 2, 1952.
Decided January 22, 1952.
*449 Before Judges JACOBS, EASTWOOD and BIGELOW.
Mr. Richard J. Congleton, Essex County Prosecutor, argued the cause for the plaintiff-respondent (Mr. C. William Caruso, of counsel, on the brief).
Mr. George R. Sommer argued the cause for the defendant-appellant, Ralph Carbone.
Mr. Pearce R. Franklin argued the cause for the defendant-appellant, Loretta Franze.
The opinion of the court was delivered by EASTWOOD, J.A.D.
Defendants, Ralph Carbone and Loretta Franze, appeal from a judgment of conviction in the Essex County Court, Law Division, of the crime of conspiracy to violate the bookmaking statute.
In substance, the indictment charged that Mrs. Franze agreed to rent her apartment located at 106 North Grove Street, East Orange, New Jersey, through Ralph Carbone, for the use of one John J. Kammerer, in furtherance of a scheme for the purpose of making book on horse races.
In the interest of a thorough understanding of the facts of the case, a chronology of events is presented, in which particular attention must be paid to the characters whose names change with the scenes in this drama of life in the underworld. One day, in the later part of June, 1950, in New York City, John J. Kammerer was introduced to a man *450 known only as "Murray" by one Moe Kalik, a man known to have been associated in the bookmaking business in New York. Kalik advised Kammerer to "Go with Murray to Jersey and he will get a phone for you." It was understood between the parties to the conversation that their purpose was to go to New Jersey to record bets on horse racing.
Kammerer accompanied "Murray" to a drug store in the vicinity of the trolley car barns on Main Street at or about the boundary between Newark and East Orange. While Kammerer waited outside, "Murray" entered the drug store and soon returned with a man introduced as "Ralph," alleged to have been Ralph Carbone, a defendant herein. After an exchange of pleasantries, "Ralph" asked Kammerer if he wanted to start that same day and received an affirmative reply with the explanation that he needed "only a scratch sheet, a pencil and some scratch paper." "Ralph" informed Kammerer that payments for the use of the phone were to be made to "Murray" and that the amount would be $150 for the first week and thereafter $300 on the first and fifteenth day of each month.
"Murray" departed and "Ralph" drove Kammerer to an automobile service station where he made a telephone call. He returned and handed him a slip of paper and advised Kammerer that his number was written thereon. That number was the telephone number of Loretta Franze's apartment, at 106 North Grove Street, East Orange, New Jersey. Kammerer called Kalik's residence in New York and left this "business number."
"Ralph" supplied Kammerer with the requisite tools of his trade, "a scratch sheet, pencil and some scrap paper," and drove him to Mrs. Franze's apartment. Kammerer was instructed to remain in the car a few minutes and then follow him into the building. In the vestibule, "Ralph" supplied him with two keys, one to the main entrance and the other for the entrance to the Franze apartment on the sixth floor of the building. They proceeded to Mrs. Franze's apartment where Kammerer was introduced as "Jack" and *451 Mrs. Franze as "Laura." "Ralph" explained the apartment layout to Kammerer and designated the table, telephone and radio to be used. Mrs. Franze was advised to give her telephone bill to "Jack" and he would pay it. "Ralph" left the apartment and was not seen again until he was identified at the trial by Kammerer to be the defendant, Ralph Carbone.
Thereafter, Kammerer occupied the apartment daily, except Sunday, between the hours of 11:30 A.M. and 5:30 P.M. He testified that he operated by receiving bets over the telephone from Kalik's customers; that a customer list was furnished him by Kalik before he left New York in the morning and that each evening on his return to New York he returned the list with bets recorded thereon to a man known as "Charlie," and that "Charlie" supplied him with the money to pay Mrs. Franze's telephone bills.
The State's case was in a large measure based on the testimony of John J. Kammerer. The persons who allegedly engaged in the conspiracy to use Mrs. Franze's apartment for bookmaking purposes were John Doe, representing "Murray," who allegedly introduced Kammerer to "Ralph," Murray's true identity being unknown; Ralph Carbone who allegedly portrayed "Ralph" and introduced Kammerer to Mrs. Franze and who arranged for the payments for the use of the apartment, furnished Kammerer with the keys to the apartment and who received payment from Kammerer for the apartment, and Mrs. Loretta Franze, who permitted her apartment to be used for bookmaking purposes, and John Kammerer. Kammerer identified defendant, Ralph Carbone, as the man to whom "Murray" had introduced him and who made the arrangements for his use of the apartment and paid Mrs. Franze the rent.
Kammerer testified that on a number of occasions Mrs. Franze was present in the rather small apartment while he was operating his business; that he had on several occasions explained to her the kinds of bets and interesting betting incidents; that it was his practice to repeat the bet for *452 verification by the bettor after it was received; that he paid Mrs. Franze twice for the telephone bill and paid "Murray" the rentals agreed upon on their first meeting and on July 1 and 15; and that he was forced to discontinue operations from the apartment in the latter part of July, 1950, because Kalik's establishment in New York had been raided by the police.
Mrs. Franze testified that early in June, 1950, she met a man known to her as "Murray Walsh" while she was in a tavern near her apartment. She stated that they met on several occasions and as not infrequently happens, they engaged in conversation, in the course of which he told her that he was in the photograph business, that he wished to put a man named Schulberg in her apartment in the afternoons for the purpose of soliciting appointments for photographs over the telephone. She told "Walsh" that if the man was satisfactory she would rent the apartment to him. The rent was to be $25 per week. "Walsh" allegedly brought the man, who later turned out to be John Kammerer, and introduced him as Jack Schulberg. "Walsh" paid her $100 rent in advance and left. Mrs. Franze admitted that she heard Kammerer use the terms "win," "place" and "show," but assumed that he was placing a personal bet. Mrs. Franze testified that Ralph Carbone was not the man who introduced Kammerer to her and that she had never seen him before the trial. Defendant, Ralph Carbone, did not testify in his own defense.
Mrs. Franze was interviewed by a county detective in July, 1950, and advised that he was investigating a complaint that her telephone had been used for bookmaking. She failed to tell the police the true nature of the business carried on in her apartment and, at the trial of this matter, explained her attitude by stating she saw no need to tell the police her personal affairs. She vacated her apartment about November 1, 1950, and went to Florida, where she remained for some time, returning to Keansburg, New Jersey, on December 1, 1950, to reside in Gallagher's Hotel, under an assumed *453 name. On the night of her arrest, Mrs. Franze was seen by police as she emerged from her hotel to enter a waiting car. As police approached, the car darted off with considerable speed and after a chase, punctuated by gunfire, the police succeeded in taking Mrs. Franze into custody.
The first ground of appeal urged by the defendants is that the court erred in refusing to grant their several motions for a verdict of acquittal, arguing that the proofs indicate, at best, a conspiracy to set up Kalik, Kammerer and others in the bookmaking business or to aid and abet them in the same and that the defendants were merely tools of the actual conspirators in executing their illicit scheme, whereas the indictment charges a conspiracy to violate the criminal laws of New Jersey, "pertaining to the making and taking of what is commonly known as a book upon the running, pacing or trotting of horses, mares, or geldings." The test generally recognized when a motion for directed acquittal is made, is whether there is any evidence from which an inference of guilt may be drawn. State v. Fox, 12 N.J. Super. 132 (App. Div. 1951). A judgment of acquittal should be denied where there is evidence of guilt which, if believed by the jury, would justify a guilty verdict. State v. Sgro, 108 N.J.L. 528 (E. & A. 1932); State v. Cammarata, 12 N.J. Misc. 115 (Sup. Ct. 1934); State v. De Falco, 8 N.J. Super. 295 (App. Div. 1950). At the conclusion of the State's case and entire case we find that there was sufficient evidence from which the jury might properly infer, as it evidently did, that the defendants engaged in an unlawful combination to violate the bookmaking statute.
The defendants contend further that the trial court erred in permitting the witness, Kammerer, to testify, over objection, as to conversations and his operations in fulfillment of the conspiracy which occurred in the absence of the defendants, since he was not named as a co-conspirator with the defendants in the indictment and, therefore, these acts were not binding upon them and his testimony concerning same was prejudicial error. Our consideration of this question *454 leads us to an opposite conclusion. Although Kammerer was a party to the overt acts involved in the conspiracy, and it was so stated in the indictment, the mere fact that he was not named as a party-defendant does not render his testimony concerning the operations in furtherance and consummation of the conspiracy inadmissible against the co-conspirators named as defendants. As stated in 15 C.J.S., Conspiracy, sec. 82, p. 1115:
"It is not necessary to join all alleged co-conspirators in an indictment for conspiracy, nor to explain why those omitted were not indicted; and it need not be alleged that all conspirators joined in the confederation at the same time."
See also State v. Garrison, 130 N.J.L. 350 (Sup. Ct. 1943); State v. O'Brien, 136 N.J.L. 118, 123 (Sup. Ct. 1947); Iponmatsu v. U.S., 281 Fed. 525 (1922), cert. denied, 260 U.S. 729 (1922). The portion of Kammerer's testimony objected to by the defendants concerned his own acts in furthering the conspiracy to violate the bookmaking statute at the home of the defendant, Loretta Franze. We think this testimony was clearly admissible. It has been held by our courts that where it appears that two or more persons conspired to commit an offense, everything done, said or written by one of them during the existence of the conspiracy and in the execution or furtherance of that common purpose, is admissible in evidence against the others. State v. Seidman, 107 N.J.L. 204 (Sup. Ct. 1931), affirmed 108 N.J.L. 550 (E. & A. 1931); State v. Guida, 118 N.J.L. 289 (Sup. Ct. 1937), affirmed 119 N.J.L. 464 (E. & A. 1938); and, as stated by Chief Justice Gummere, speaking for the Supreme Court, in State v. Lieberman, 80 N.J.L. 506, 509 (Sup. Ct. 1911), affirmed 82 N.J.L. 748 (E. & A. 1912): "The jury have the right to convict on testimony of an accomplice if, in their judgment, the testimony is entirely credible and worthy of belief." Cf. State v. Fearce, 113 N.J.L. 155, 159 (E. & A. 1934); State v. Gaddis, 131 N.J.L. 44 (Sup. Ct. 1943); State v. Hogan, 13 N.J. Misc. *455 117 (Sup. Ct. 1935). As stated in State v. Gregory, 93 N.J.L. 205, 210 (E. & A. 1919), citing Stewart v. Johnson, 18 N.J.L. 87 (Sup. Ct. 1840):
"One who participates in the corrupt agreement with knowledge that it is corrupt, and that what he is doing is in furtherance of that agreement, would be as guilty as if he had, originally conspired, * * *."
Cf. State v. Klausner, 4 N.J. Super. 427, 429 (App. Div. 1949), certification denied 3 N.J. 378 (1949). And in State v. Garrison, supra, it was held that: "A conspiracy may be proved by overt acts done in pursuance thereof." "It is not requisite that the conspirators know each other, or that they should all join in the common purpose at the same time. People v. Strauch, 240 Ill. 60, 88 N.E. 155 (1909); Burdicks Law of Crime, Sec. 999." State v. Lennon, 3 N.J. 337, 343 (1949).
The defendants further contend that the trial court's answer by means of a hypothetical example to a question propounded by the jury during its deliberations concerning the required proof of conspiracy constituted error and prejudicial to the defendant, Loretta Franze. The following is the specific colloquy between the court and the jury, viz.:
"Is a person a conspirator if he or she rents his or her apartment to his or her knowledge for a legitimate business and then later finds out by chance that the business is illegal and then does nothing about it?"
In answer thereto, the court stated:
"On the basis of those exact words, the answer is no. On the other hand, in order to clarify the thing in your mind, if in addition to that doing nothing about it, under those circumstances, she paid rent to one of the parties, and said to them for instance at the time, `I understand now what you are doing. Go ahead, I am with you,' in other words, indicating that she became a party to the enterprise with them, or words to that effect, then vice versa.
It is the agreement, the understanding, by the individual that she *456 was or she was not a part of the enterprise, which would make her guilty or not of the conspiracy, under the circumstances alluded to by you, as I have endeavored to amplify them. Does that make it clear, Mr. Foreman?"
Incidentally, it cannot be seriously challenged that when the court stated "she paid rent to one of the parties," it intended to say "she received rent from one of the parties." No reversible error can be charged to what appears to be merely a slip of the tongue. Defendants contend that the trial court's answer to the jury's question was tantamount to acts of advocacy in favor of the prosecution to the prejudice of the defendants and contained a factual statement not supported by the evidence. The settled rule in New Jersey permits the trial judge to comment upon the evidence and, in cases where he thinks it is required for the promotion of justice, to express his views upon the weight of it, provided he leaves to the jury the sole determination of the factual issues. State v. Hauptmann, 115 N.J.L. 412 (E. & A. 1935); State v. Pinsky, 6 N.J. Super. 90 (App. Div. 1950). An examination of the trial judge's charge reveals that he had already stated to the jury that in order to convict it would have to determine: (a) that a conspiracy did exist; (b) that the defendants were parties to it, and (c) what overt act or acts were committed pursuant to the conspiracy for which any of the defendants were responsible by reason of their own acts or the acts of another conspirator to effect the common purpose. In addition, the court, in clear and decisive language instructed the jury that "the facts are solely and entirely yours. Nobody else in the world but you has the right to say specifically what the facts in this case are and that is rather important, isn't it, because certain parts of the evidence are contradictory. Therefore, the importance of your function is obvious and crucial," and then proceeded to elaborate somewhat in detail as to the function of the jury in its consideration and determination of the factual issues. While the trial court may have indicated in some instances his individual view, we fail to find in any instance *457 that his view was so placed before the jury as to require them to consider themselves controlled by it. On the contrary, the court was careful to reserve to them the ultimate decision on matters of fact. As stated by Mr. Justice Wachenfeld, in State v. Tansimore, 3 N.J. 516 (1950), at p. 525:
"In determining whether or not error was committed, a single sentence may not be extracted and construed without regard to the context of the entire charge. State v. Banusik, 84 N.J.L. 640 (E. & A. 1906). The court cannot state the law of the case in a single sentence and the charge must be read as a whole in the light of a sensible construction to determine its legal worth. State v. Tachin, 92 N.J.L. 269 (Sup. Ct. 1919); affirmed, 93 N.J.L. 485 (E. & A. 1919)."
The defendants contend further that the trial court erred in that portion of the charge wherein it commented upon the failure of Carbone to testify in his own behalf. The defendant points out that prior to the criticised portion of the charge, the jury was instructed: "And here I don't think the State contends that we have any direct evidence of entry into a formal agreement by the parties," and asserts that the court proceeded to charge as to circumstantial evidence, arguing that this clearly showed that the court did not feel there was any direct proof of the crime charged in the indictment. In commenting upon the effect of the defendant's failure to testify, the court charged that if "* * * I make a charge against you and you fail to deny it, as I say, not only a general charge but that you did fact `A' personally, you did fact `B' personally, you did fact `C' personally, and then, given the opportunity, you say not a word, but just take it, you know by common sense, and common law, that there is a presumption that you cannot truthfully deny the charges." The defendants rely upon the case of State v. Friedman, 136 N.J.L. 527 (E. & A. 1948), in support of this contention. The Friedman case, however, is not applicable. In that case, it was held that: "* * * there is a distinction between that situation and one when the *458 evidence is merely circumstantial from which the jury may draw an inference of the defendant's guilt of the charge. The defendant could only meet such a possible inference by a general denial of the charge. This he does not have to do and therefore he cannot be criticised for such refusal." In the case sub judice, there was testimony of specific acts charged to the defendant Carbone, inculpatory in character, which the defendant could have denied if he had so desired. However, he chose not to take the stand as was his privilege; therefore, the court properly commented upon his failure to do so.
We have examined the other grounds of appeal and find no merit therein.
The judgment of the Essex County Court, Law Division, is affirmed.