THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
ALFONSE J. BEGYN, DEFENDANT-RESPONDENT.

Argued September 12, 1960—Decided January 10, 1961.

36

*Mr. Frank J. Cuccio,* Bergen County Assistant Prosecutor, argued the cause for plaintiff-appellant (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney and of counsel; *Mr. Cuccio* on the brief).

*Mr. Louis Santorf* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HALL, J. This case is here on the State's appeal as of right by reason of a dissent in the Appellate Division. *R. R.* 1:2–1(b). The judgment there reversed a conviction for the common-law offense (*N. J. S.* 2A:85–1) commonly referred to as misconduct in office and ordered a new trial. 58 *N. J. Super.* 185.

Defendant's contention that the State's proofs so failed to establish the crime charged as to have entitled him to a direction of acquittal was rejected by all members of the court, but the majority found errors in the charge necessitating reversal. The dissenting judge was of the opinion that the charge taken as a whole, in the light of the trial theory and proofs, did not evidence manifest wrong, injury or prejudice to the accused. *R. R.* 1:5–1. All questions are again presented to us. While we agree that a reversal was required and generally concur in the grounds on which it was put, our study of the record, briefs and oral arguments convinces us of some confusion in the minds of the trial court and counsel as to the elements of the offense not entirely clarified by the opinion of the Appellate Division. In view of the new trial to ensue as well as the general public importance of the matter, we deem it advisable to speak further.

The indictment first charged that defendant, sanitary inspector in the health department of Fair Lawn, had the duty of rendering public service to the borough "to the best of his ability and uninfluenced by motives adverse to the best interests of said Borough and the duty not to request or accept any gift, gratuity or promise to make any gift

under an agreement and understanding that he would act in any particular manner with reference to the affairs of his employer * . * *." It went on to allege that, in violation of that duty, he, willfully, unlawfully and corruptly, demanded and received from a scavenger who held the garbage removal contract in the municipality a promise for the payment of money to him for services he *would* perform to protect the scavenger against problems which might affect the contract. The services were specified as the use of his influence and office "to take care of and minimize" complaints arising out of the removal of garbage, which might be brought to him in his official capacity, and to avoid any declaration of default on the contract and resultant forfeiture of the performance bond. Finally it was asserted that, "by virtue of the corrupt agreement aforesaid," the scavenger paid him some $2,500 in installments over a period of about 7 months in 1955. It will be noted the indictment did not charge that defendant performed the alleged services. The gravamen of the misconduct was the entering into of the corrupt agreement. At this point it may be further said that at the trial defendant admitted receiving the money, but claimed it was for another and lawful purpose.

We should observe, too, that defendant was also indicted for extortion (*N. J. S.* 2A:105–1) in connection with the same payments. That indictment, in separate counts for each payment, charged in the language of the statute, that he, a public officer, by color of his office, unlawfully received and took from the garbage contractor, a specified sum "being a fee or reward not allowed by law * * * for performing his duties as the public officer aforesaid." The State moved to consolidate the indictments for trial, but the motion was denied in an order which stated no reason. The prosecution was directed to elect which indictment it would proceed upon and the misconduct charge was chosen. Although the propriety of the denial of consolidation has not been raised by the State, our view of the total situation makes it desirable to return to this phase of the matter later.

██ We thoroughly agree with the Appellate Division that there was not the slightest doubt both at the end of the State's case and the entire case of the clear sufficiency of evidence from which the jury could find the factual allegations of the indictment to have been established. In the first place, the Borough Manager, chief executive officer of the municipality and defendant's superior in the health department during the period involved, testified explicitly that defendant's "duties were to receive all garbage complaints and investigate and correct them if necessary," that he had assigned to defendant "the obligation of enforcing the garbage contract," and that the latter had in fact performed those duties. There is no sound basis for defendant's contention that the State failed to prove its case because the indictment alleged he held the office of sanitary inspector when in fact the proofs showed that technically he did not have or may not have been legally entitled to that title. The relevant duties actually assigned and undertaken are controlling in this type of situation and not the mere matter of designation of a title.

 Moreover, the relation of defendant's duties to the subject matter of his alleged agreement with the scavenger is obvious. Not present here is the situation which concerned this court on one aspect of *State v. Weleck,* 10 *N. J.* 355 (1952), where it was necessary to determine the relation of the duty of a borough attorney to the enactment of a proposed zoning ordinance amendment, the passage of which he allegedly offered to influence in exchange for a sum of money. In addition, there can be no question but that defendant, no matter what his title, is an "officer" within the requisite that one must occupy such a status to be amenable to a charge of misconduct and related offenses. *Kirby v. State,* 57 *N. J. L.* 320 (*Sup. Ct.* 1894). Formalistic definitions and differentiations sometimes applied in other contexts (*e. g., Fredericks v. Board of Health of Town of West Hoboken,* 82 *N. J. L.* 200 (*Sup. Ct.* 1912)) have no place

here. The scope of the term should be governed by the nature of the particular problem. *Reilly v. Ozzard,* 33 *N. J.* 529 (1960). The underlying basis of the various crimes of official misconduct is the breach of a duty of public concern by one who by virtue of his position—whatever it might be called—is in some way entrusted with the public welfare. So the definition of "officer" with respect to any such crime must be so broad that no public employee can claim to be outside its circumscription so long as the alleged misconduct is at all related to his official duties and obligations, express or inherent. *Cf. State v. Goodman,* 9 *N. J.* 569, 583–584 (1952).

To return to the proofs, it is also not debatable that the State's evidence permitted the jury legitimately to find that defendant entered into the agreement with the contractor outlined in the indictment and that he did so with evil intent. Both the manager and scavenger testified that, during 1954 when the latter said defendant first demanded money and in 1955 when it was concededly paid to him, there was a large volume of citizen complaints about the admittedly poor garbage service. These included failure to make collections at all on appointed days and collecting at hours other than those specified in the contract, as well as less serious deficiencies. The contractor was in difficulties and had called in other scavengers who were actually making most of the collections. The contract contained provisions, with which defendant was acquainted, whereby the municipality could terminate for breaches and realize on the performance bond. The testimony of the heads of the contractor's business, outlined in detail in the opinion below (58 *N. J. Super.,* at *pp.* 192–193), was more than adequate to justify a jury conclusion that defendant sought money on the representation that he had been aiding the contractor and minimizing, as far as the borough authorities were concerned, the complaints as best he could and would continue to do so, with the object of preventing any declaration of default on the contract and that the sums were agreed to be paid and were

paid on that basis. There is, therefore, no basis whatever for the contention that the State failed to establish the factual allegations of the indictment on its case.

The factual defense tendered did not change this posture. On vital aspects, it relied almost entirely on defendant's own testimony. He admitted receiving the money and his only explanation was that it was given to him voluntarily and at the suggestion of the heads of the scavenger business in 1955 to carry out a commitment made by the deceased former operator in 1954 which could not then be met because of the financial condition of the business. His story was that by reason of the many complaints in 1953 and 1954, caused generally by unfamiliarity with the work and poor performance of others whom the contractor had called in to assist, it became necessary for him to be out in the town before and after his appointed work-day hours as well as on Saturdays and Sundays to make sure that the trucks made the required collections and to investigate and rectify the many complaints pressed; that the deceased operator, in appreciation of his assistance, had in 1954 gratuitously offered to compensate him in the future for this extra time; and that the 1955 payments were to carry out that promise. His testimony was not clear whether he had performed the same extra hours work in 1955. The defense may be said to have rested on his own bald declaration that the payments were not for or in connection with the performance of his duties for the borough. His testimony, however, was not at all precise on the basis for the conclusion, *i. e.,* whether it was simply because the work was done outside of his regular work hours of 9 A. M. to 5 P. M. or whether these services in the field merely went beyond his conception of his assigned duty of enforcing the garbage contract. The municipal manager was not called as a witness for the defense nor when testifying for the State was this phase of the subject explored by cross-examination beyond testimony that defendant had satisfactorily conducted his office. In any event, there was no intimation by defendant that

these services in the field were performed at the request
of the contractor. Any possible inference that this work
went beyond the scope of his duties was very considerably
weakened by defendant's earlier testimony on direct examina-
tion that in the latter part of 1953 he had sought additional
compensation from the manager because of these duties and
the extra time spent and that the latter had agreed with him
but knew of no way to provide it. It should also be noted
that, according to defendant, he continued to do this off-
hour work during 1954 at least, that his salary was increased
in that year and again in 1955 and that he never told the
manager of the money he received from the contractor in
the latter year.

Consideration of the legal issues should be had in
the light of a clear understanding of the elements of mis-
conduct in office and related offenses as those crimes exist
in New Jersey today. Some basic confusion is found because
the term "misconduct in office" is sometimes used in a
generic sense to refer broadly to all official wrongdoing, thus
including in its sweep the more particularized crimes of
extortion, bribery and the like, as well as in the special
sense, as here, to designate an offense which bears no other
name and is comprised of elements differing in some par-
ticulars from those of the related crimes. Distinctions have
become shadowy and labels imprecise and somewhat non-
exclusive. There are many situations, like that before us,
where essentially the same factual situation could properly
ground a prosecution for more than one of these offenses.

Let us first consider extortion. It should be noted
at the outset that we are not here concerned with the term
as used in its popular sense of "frightening" money out of
people by threats, although that too may constitute a dis-
tinct offense. *State v. Morrissey,* 11 *N. J. Super.* 298 (*Cty.
Ct.* 1951); see also *N. J. S.* 2A:105-3 and 4. Our inquiry
is limited to the crime in its classic sense, extended by our
cases, as it relates to the wrongful taking of money by a
public officer, whether accompanied by "threats" or not.

Our extortion statute, *N. J. S.* 2A:105–1, which had its origin at least as early as 1796 (*Paterson, Laws* (1800), p. 212), appears on its face to have been originally intended to be reiterative of the common law. *State v. Goodman, supra* (9 *N. J.*, at p. 584). *Cf. State v. Weleck, supra* (10 *N. J.*, at p. 371). The essence of that offense was the receiving or taking by any public officer, by color of his office, of any fee or reward not allowed by law for performing his duties. The purpose would seem to be simply to penalize the officer who non-innocently insisted on a larger fee than he was entitled to or a fee where none was permitted or required to be paid for the performance of an obligatory function of his office. The matter was obviously of particular importance in the days when public officials received their compensation through fees collected and not by fixed salary. Our early cases dealt with precisely this kind of a situation. *Halsey v. State,* 4 *N. J. L.* \*324 (*Sup. Ct.* 1816); *State v. Maires,* 33 *N. J. L.* 142 (*Sup. Ct.* 1868); *Cutter ads. State,* 36 *N. J. L.* 125 (*Sup. Ct.* 1873); *Lane v. State,* 49 *N. J. L.* 673 (*E. & A.* 1887); *Loftus v. State,* 52 *N. J. L.* 223 (*E. & A.* 1889) (opinion reported only in 19 *A.* 183). See also *State v. Seidman,* 107 *N. J. L.* 204 (*Sup. Ct.* 1931), affirmed *sub nom. State v. Fischman,* 108 *N. J. L.* 550 (*E. & A.* 1931).

After a couple of opinions possibly indicating an extension to cover payments demanded for the favorable exercise of discretionary powers of the officer (*Kirby v. State,* 57 *N. J. L.* 320 (*Sup. Ct.* 1894); *Conway v. State,* 8 *N. J. Misc.* 406 (*Sup. Ct.* 1930)), an enlarged construction of the statute to its present day scope was announced in *State v. Barts,* 132 *N. J. L.* 74 (*Sup. Ct.* 1944), affirmed opinion below 132 *N. J. L.* 420 (*E. & A.* 1945). There on the trial of an indictment under the statute the State's proofs showed that a police officer of another state had demanded money, which was paid to him in New Jersey, in return for his agreement not to arrest a person who had committed larceny in New York. The contention was advanced that extortion

did not lie because he was paid for *not* doing his duty. The court rejected the argument saying that he had, within the meaning of the statute, received a reward "not allowed by law for doing his office." Since that decision, it is clear that a violation of our statute occurs whenever an officer, by color of his office, receives a reward to which he is not legally entitled by reason of or in connection with his official duties. *State v. Weleck, supra* (10 *N. J.,* at *pp.* 370–373); *State v. Matule,* 54 *N. J. Super.* 326 (*App. Div.* 1959); *cf. State v. Goodman, supra* (9 *N. J.* 569). This present concept of the crime thus overlaps the offense of bribery since extortion is committed even where the object of the payment is in reality to influence an officer in his official behavior or conduct without such having to be established. The proof of receipt of a knowingly unlawful payment in connection with his duties is enough and furnishes the necessary criminal intent. From what has been said it is apparent that the State's proofs in the instant case clearly made out the offense of extortion without proof of the corrupt agreement between Begyn and the scavenger or even if such proof were to be disbelieved by the jury.

We next turn to common-law bribery, a very broad offense which has always existed in New Jersey as an indictable misdemeanor. *State v. Ellis,* 33 *N. J. L.* 102 (*Sup. Ct.* 1868); *State v. Srholez,* 16 *N. J. Super.* 344 (*Law Div.* 1951). It consists in "receiving or offering any undue reward by or to any person whatsoever, in a public office, in order to influence his behavior in office and incline him to act contrary to the known rules of honesty and integrity." 1 *Schlosser, Criminal Laws of New Jersey,* § 390 (1953). See also *Perkins, Criminal Law,* 396–399 (1957). The crime is committed by the mere offer as well as by the actual payment; in the latter event it is of no moment that the original solicitation may have been by the officer rather than the briber. It is not necessary that the act requested be one which the official has authority to do. Sufficient it is if he has official power, ability or

apparent ability to bring about or contribute to the desired end. *Perkins, op. cit.*, 405–406. Both the offeror and the recipient are guilty of the offense and it makes no difference whether the official action bargained for thereafter actually takes place. (Apparently mere solicitation of a bribe by or on behalf of an officer, without payment being made, did not constitute bribery at common law but it has been made a crime in certain situations by our statutes. *N. J. S.* *2A*:93–4 and 6. *State v. Merkle*, 82 *N. J. L.* 172 (*Sup. Ct.* 1912), reversed on other grounds, 83 *N. J. L.* 677 (*E. & A.* 1912); *State v. Smagula*, 39 *N. J. Super.* 187 (*App. Div.* 1956). Such does, however, amount to attempted extortion. *State v. Weleck, supra.*) The necessary *mens rea* on the part of the briber, if he is the accused, requires only an intent to subject the official action of the recipient to the influence of personal gain or advantage rather than public welfare since the social interest demands that official action should be free from improper motives of personal advantage. On the part of the bribee, if he be the one charged, an intent to use the opportunity to perform a public duty as a means of acquiring an unlawful personal benefit or advantage supplies the necessary corrupt intent. *Perkins, op. cit.*, 406. It seems obvious that, on the State's proofs, a case of common-law bribery was also made out against both the payor and defendant.

Official misconduct in the special sense, to which we now advert, does not necessarily involve money as do the crimes of bribery and extortion, but as a common-law offense is much more inclusive. Parenthetically it may be observed that the tendency in New Jersey has been to indict for misconduct and not for extortion or bribery where money has been paid despite the fact that such a course requires the State to prove additional elements relating to the officer's conduct after the payment or, at least, as here, a corrupt agreement on defendant's part pursuant to which the consideration was handed over. *E. g., State v. Jefferson*, 88 *N. J. L.* 447 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 507

(*E. & A.* 1917); *State v. Plough,* 88 *N. J. L.* 425 (*Sup. Ct.* 1916), rehearing denied 88 *N. J. L.* 428 (*Sup. Ct.* 1916); *State v. Fisher,* 94 *N. J. L.* 12 (*Sup. Ct.* 1920), reversed on other grounds 95 *N. J. L.* 419 (*E. & A.* 1921); *Henderson v. State,* 7 *N. J. Misc.* 520 (*Sup. Ct.* 1929); *State v. Garrison,* 130 *N. J. L.* 350 (*Sup. Ct.* 1943); *State v. Hogan,* 137 *N. J. L.* 497 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 375 (1949); *State v. Dunphy,* 19 *N. J.* 531 (1955), 24 *N. J.* 10 (1957).

Definitions of misconduct in office are necessarily broad. This court in *Weleck* (10 *N. J.,* at *p.* 365) relied on a definition by Professor Burdick in his *Law of Crime,* § 272. The recent expression by Professor Perkins (*op. cit.,* 413) is equally apt: "Misconduct in office is corrupt misbehavior by an officer in the exercise of the duties of his office or while acting under color of his office." This authority is helpful in specifying more detailed elements when he says this:

"The prevention of outside influences tending toward corruption is not the only social interest in the official action of public officers. It is socially desirable, so far as reasonably possible, to insure that no public officer shall, in the exercise of the duties of his office or while acting under color of his office, (1) do any act which is wrongful in itself—malfeasance, (2) do any otherwise lawful act in a wrongful manner—misfeasance, or (3) omit to do any act which is required of him by the duties of his office—nonfeasance. And any corrupt violation by an officer in any of these three ways is a common-law misdemeanor known by some such name as 'misconduct in office' or 'official misconduct.' " *op. cit.,* at *p.* 409.

And such is the foundation of the offense in this State, although precise sub-labelling is not always found and is not requisite. *State v. Startup,* 39 *N. J. L.* 423 (*Sup. Ct.* 1877); *State v. Kern,* 51 *N. J. L.* 259 (*Sup. Ct.* 1889); *State v. Castle,* 75 *N. J. L.* 187 (*Sup. Ct.* 1907); *State v. Jefferson, supra; Henderson v. State, supra; State v. Bolitho,* 103 *N. J. L.* 246 (*Sup. Ct.* 1927), affirmed opinion below 104 *N. J. L.* 446 (*E. & A.* 1927); *State v. Donovan,* 132 *N. J. L.* 319 (*Sup. Ct.* 1945); *State v. McFeeley,* 136

*N. J. L.* 102 (*Sup. Ct.* 1947); *State v. Jenkins,* 136 *N. J. L.* 112 (*Sup. Ct.* 1947); *State v. Weleck, supra; State v. Winne,* 12 *N. J.* 152 (1953); *State v. Williamson,* 54 *N. J. Super.* 170 (*App. Div.* 1959), affirmed 31 *N. J.* 16 (1959); *State v. Cohen,* 32 *N. J.* 1 (1960).

 Criminal intent is, of course, an essential element. The word generally used to describe the nature of such intent is "corruptly"—employed in the instant indictment along with "willfully" and "unlawfully." Perhaps too much emphasis has been placed on the exact adverb to be used, as witness the haggling and hair-splitting so frequently noted in the cases. There is no particular magic in any word so long as the indictment charges and the proofs support the conclusion that the acts alleged were done with evil motive or in bad faith and not honestly. The degree or nature of the requisite evil will vary with the situation. For example, in nonfeasance, intentional and deliberate refusal or forbearance to perform one's clear duty, without lawful excuse, sufficiently described by the phrase "willfully and unlawfully" is adequate, whereas mere negligence or honest mistake of judgment is not enough. Such is the true meaning of the language used in *State v. Winne, supra* (12 *N. J.,* at *pp.* 175–177). *Cf. State v. Orecchio,* 27 *N. J. Super.* 484–489–490 (*App. Div.* 1953), affirmed 16 *N. J.* 125 (1954). And in all misconduct cases, even though it may be impossible to present direct proof of an express agreement, "actions speak louder than words" in the search for corruption. *State v. Jefferson, supra* (88 *N. J. L.,* at *p.* 449). In the instant case direct proof by the State of an actual corrupt agreement was most ample and so we see no basis whatever for defendant's contention that an evil intent to commit misconduct in office was not established.

 Perhaps more fundamentally, defendant urges that he was entitled to acquittal because neither the indictment charged nor the State's proof established that he in fact carried out his agreement not to enforce the garbage contract properly and completely. It is, of course, true that

the indictment alleged only that he *would* do certain things in violation of his assigned tasks and the evidence was quite thin to show that he actually did them, at least after the agreement was entered into. The thrust of the argument is that an official does not commit the crime of misconduct unless he lives up to his promise to do the evil for which he took money. While the point appears to be novel, we have no hesitancy in saying that it is completely without merit. The indictment quite properly in substance alleged the duty of any official to be to perform the tasks assigned to him uninfluenced by adverse motives engendered by requesting or accepting any gift, gratuity or promise under an agreement either evilly not to do some of the very functions of his position at all or to do them in a manner contrary to the public interest. Such a duty is an inherent and fundamental one, specifically related to the particular office and founded on something more than a mere moral concept. *Cf. State v. Cohen, supra* (32 *N. J.* 1) ; *State v. Weleck, supra* (10 *N. J.,* at *p.* 369). The very statement of the proposition leads to the irresistible conclusion that it is as much criminal misconduct to take money under such an understanding and not carry out the undertaking as it is to do the same thing and perform the agreement. *Cf. People v. Clougher,* 246 *N. Y.* 106, 158 *N. E.* 38, 40 (*Ct. App.* 1927).

Finally we come to the portions of the charge, set forth at length in the majority opinion below (58 *N. J. Super.,* at *pp.* 196–201) which were held to be erroneous and require reversal. We should interject that we find sufficient objection thereto was made at the trial, albeit not as articulately as might have been, so that the plain error rule is not involved. We agree with the majority that such portions were prejudicially erroneous, because in the way they were put they would permit the jury to find defendant guilty based on an act of misconduct other than the entering into of the corrupt agreement charged in the indictment. But, even more important, we feel that certain parts should not have been charged at all since the evidence

and theory set forth therein did not even amount to the crime of misconduct. The whole situation thereby created was such that it cannot be said but that manifest injury and prejudice were suffered.

The parts to which we have particular reference were those where the jury was told it might find defendant guilty merely on his own testimony that he received money from the contractor for doing work unrelated to his official duty with respect to the performance of the contract he was assigned to supervise and enforce. The express statement was made: "You cannot serve two masters with adverse interests, and when you do, if you do, you are guilty of misconduct in office." While such an ethical conflict of interests might warrant removal of the official (see *State v. Cohen, supra,* concurring opinion, 32 *N. J.,* at *p.* 12; *Perkins, op. cit.,* 410–411), it does not amount to the crime of official misconduct. The trial court probably had in mind the observation in *Weleck* (10 *N. J.,* at *p.* 369) proposing a duty in a public officer to regulate his official conduct in accordance with basic moral principles on penalty of prosecution for misconduct in office, but this instruction goes far beyond anything contemplated by the *Weleck* suggestion or the facts of that case. The reason is that it would brand misconduct as criminal without the essential requisite that it was undertaken with evil or corrupt motive. Defendant would have to be acquitted of misconduct in office if the jury should believe his story that the compensated work he said he did for the scavenger was actually beyond his municipal duties and not adverse to those duties and the public interest.

Some further mention should be made of the trial court's charge on the so-called accomplice rule in connection with the jury's consideration of the prosecution testimony by two representatives of the scavenger detailing the corrupt agreement and their payment of money to defendant pursuant thereto, which was found to be erroneous by the Appellate Division. 58 *N. J. Super.,* at *pp.* 195–196. The judge

charged that these witnesses were "accomplices" and *"as much guilty of misconduct in office as the defendant under their own testimony."* He went on to say that "a jury may convict a defendant on the testimony of accomplices alone, if you believe them and find their testimony credible, but the testimony of an accomplice must be given close scrutiny because obviously an accomplice, *a person who has committed the crime with the person charged,* has a special interest in the case. They may be currying favor with the State and testifying against the defendant falsely just to curry favor and cover themselves and get out of the thing themselves." (emphasis supplied.)

The general subject matter had been expressly requested by defendant and the term "accomplice" had been used in the request. His objection to the charge as given was that the portions italicized above amounted to an expression by the court that he was necessarily guilty simply because the witnesses had admitted their own criminal conduct in complicity with him. It is, of course, no ground for reversal that a trial judge, in cases where he thinks it is required for the promotion of justice, expresses his views on the weight and value of evidence, even to the extent of an opinion as to guilt, so long as he plainly leaves the sole determination of all factual issues to the jury, as was done here. *State v. Peterson,* 10 *N. J.* 155, 162 (1952); *State v. Carbone,* 17 *N. J. Super.* 446, 456 (*App. Div.* 1952), affirmed 10 *N. J.* 329 (1952); *State v. Hauptmann,* 115 *N. J. L.* 412, 429 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935).

Technically the witnesses' admissions here were not of the crime of misconduct in office, which, not being public officials, they could not commit. Their testimony did, however, establish criminal conduct on their part as aiders and abettors to misconduct, aiders and abettors to extortion or principals in bribery. At the time they gave their testimony they had not been charged with any such offense and one of them denied on cross-examination any promise by the prosecutor

that he would not be indicted if he testified for the State. (He also admitted he was then under indictment for an unrelated crime, but defendant requested no charge relating to scrutiny of testimony for that reason, so we are not concerned with the matter of a cautionary instruction where only that situation is involved.)

 New Jersey has always followed the common-law rule that a defendant may be convicted solely on the uncorroborated testimony of an accomplice. *State v. Hyer*, 39 *N. J. L.* 598 (*Sup. Ct.* 1877). However, it is clear in this State that a defendant has a right, upon request, to a specific jury instruction "that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his specific interest in the proceeding" (*State v. Spruill*, 16 *N. J.* 73, 80 (1954)) and that a judge may, with entire propriety, make the cautionary comment to the jury on his own motion in situations where the circumstances indicate to him the advisability of doing so. As the *Spruill* case indicates, unlike those jurisdictions which require corroboration of the testimony of accomplices (see 7 *Wigmore, Evidence,* §§ 2056–2060 (*3d ed.* 1940)), we need not be concerned with technical definitions of "accomplice" which would limit the applicability of the rule to witnesses who are indictable for precisely the same crime as that for which the defendant is standing trial. *Cf. State v. Dunphy,* 19 *N. J.* 531, 535 (1955). Rather, our "accomplice rule," if it can be called a rule, simply relates to a cautionary comment by the court regarding the credibility of witnesses who may have a special interest in the outcome of the cause, which might lead to influencing their testimony, because of some involvement in the criminal situation out of which the indictment and trial of the defendant arose. *State v. Engels,* 32 *N. J. Super.* 1, 13–14 (*App. Div.* 1954). This special interest comes about by reason of hope, or even bargain, for favor in later prosecution treatment of the witness' own criminal conduct in return for aid in convicting the defendant.

The charge is, of course, for the benefit of the defendant and is particularly appropriate where the witness has been charged with the same offense and may be guilty thereof though the defendant on trial is not. A classic example is a robbery indictment against several persons in which some admit their guilt and testify against one on trial who denies all connection with the enterprise. Even here the charge may well have risks for the defendant because phrasing is difficult to avoid conveying to the jury an impression that the court is suggesting his guilt solely because the witnesses have admitted theirs and implicated him. See Annotation, *Accomplices, Question of Law or Fact,* 19 *A. L. R.* 2d 1352, 1356 (1951). Avoidance of use of the term "accomplice," with its rather opprobrious connotation against a defendant, may tend to lessen this risk somewhat. See, for example, the language of the requested charge which this court held was erroneously refused in *Spruill* (16 *N. J.* 93) as set forth in full in the opinion of the Appellate Division therein (28 *N. J. Super.* 381, at *pp.* 384–385).

The risk of prejudicial connotation of the charge is very likely to be increased in a situation, as here, where the witness can be guilty of no crime unless the defendant is also guilty. And it may be said the need for the charge decreases, for the witness is absolved unless the defendant, with his aid, is found guilty and so the motivation to curry favor with the State is lessened. Moreover, an astute jury might well think that, logically, in order to discredit the witness, it must first find the defendant guilty. All motive for testimony favorable to the prosecution cannot be said with certainty to have completely disappeared, however. The fact that a person is willing to admit under oath his own criminal conduct and become a witness for the State itself militates against such a conclusion. *Cf. State v. Black,* 97 *N. J. L.* 361, 363 (*Sup. Ct.* 1922). And one cannot be positive that a layman would appreciate his guilt was dependent on that of the defendant or that he might not have some reason in his mind for seeking the goodwill of the State. Under

such circumstances, after weighing the possible benefits against the potential harm, a defendant might wisely refrain from requesting the charge, but if he insists, as Begyn did here, it would seem he is entitled to the instruction. It is quite unlikely a trial judge would give it in this particular situation unless he is satisfied the defendant desires it, realizing the dangers. If given, the judge should use guarded language clearly indicating that the caution to scrutinize the witness' testimony because of involvement in the crime is not in itself to be considered an indication of the defendant's guilt. The language used by the trial judge in the instant case that the witnesses were "as much guilty * * * as the defendant" was not as carefully chosen as it could have been and might well have tended to convey the opposite impression to the jury. However, if this were the only error in the case, we do not believe it would be sufficiently prejudicial to require a reversal, especially since, as we have indicated, the request unavoidably incurs a considerable risk along this line.

We said earlier that defendant was also indicted for extortion in connection with the same payments and that the trial judge refused to permit consolidation of the indictments for trial. We think this was not justified under the circumstances and that the State should be permitted to reapply prior to the new trial. The two offenses are based on the same act or transaction within the meaning of *R. R.* 3 :4–7 and so could have been joined as separate counts in the same indictment. When this is the situation, joinder of separate indictments for trial is expressly permitted by *R. R.* 3 :5–6. *Cf. State v. Manney,* 26 *N. J.* 362 (1958). While the crimes are distinct and have in part different elements, the proofs offered by the State, and for that matter the defense, would be substantially the same on each. Defendant could be found guilty of both crimes (with the court sentencing only on one of the offenses) if the agreement were sufficiently established and the evidence thereof believed by the jury. Even if it were not established or the testimony disbelieved resulting in acquittal of misconduct, he could

still be found guilty under the indictment charging extortion pursuant to the principles applicable to that offense previously discussed. We can conceive of no sound reason why the indictments should not be tried together in the interest of both parties and the sound and expeditious administration of criminal justice.

The judgment of the Appellate Division is affirmed.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice HALL except with respect to its treatment of the trial court's charge relating to the testimony of an "accomplice."

The charge concerned the testimony of the witnesses Ralph and Josephine Mastrangelo. Defendant himself submitted seven requests on the subject. All expressed the theme that the testimony of the witnesses, although legally sufficient, should be scrutinized because of the hope of reward they might have with respect to their own criminal involvement. The first request read in part:

"The testimony in the main in this case comes from the lips of Ralph and Josephine Mastrangelo. They have admitted their part in this alleged crime, and as such, they are what we call, in law, accomplices. The term accomplice takes in all the *particeps criminis*. An accomplice is a guilty participant with others, in the same crime, either in the same or a different degree * * *."

The trial court acceded to defendant's requests but said in lieu of the portion quoted above:

"The two Mastrangelos, Ralph and Josephine Mastrangelo, who testified for the State in this case, are classified by the Court and I charge you that they are what we call accomplices in this case, in this offense charged in this indictment. They admittedly gave money to the defendant Begyn to serve their own interest under their garbage contract and *they are as much guilty of misconduct in office as the defendant, under their own testimony*." (Emphasis added)

Defendant complains of the language I have italicized.

Insofar as the court said defendant was guilty of misconduct in office if the Mastrangelos were believed, the comment was perfectly proper.

Defendant seems to complain it was error to say that upon their own testimony the Mastrangelos were guilty of *misconduct in office*. Whether as aiders and abettors they could be charged with that particular crime, is immaterial. The misnomer, if such it was, could not possibly prejudice defendant.

Defendant's real grievance, as I see it, is that the instruction was tantamount to a charge that he was guilty. There is substance in this complaint, but the grievance was of defendant's own making. He asked for the "accomplice" charge in circumstances in which it was inapt. The reason is that since the witnesses could not be guilty unless defendant too was guilty of the offense for which he was on trial, an instruction characterizing the witnesses as guilty of crime had to carry the implication that by the same token defendant too was guilty. To state it in other terms, defendant's requests to charge involved a paradox, to wit, that the jury was asked to view cautiously the testimony of the witnesses upon a premise which simultaneously imported defendant's guilt, and this because the witnesses could not be guilty unless defendant too was guilty. It would be quite a feat for a jury both (1) to discredit the witnesses because they believed their incriminating testimony and (2) thereupon to acquit the defendant by disbelieving the very testimony they had already accepted as the truth. That the requests to charge were inappropriate becomes more evident when one considers the policy behind and the role accorded to the so-called "accomplice" charge.

As Mr. Justice HALL points out, the testimony of an "accomplice" suffices in our State to support a conviction even though it is uncorroborated. In jurisdictions in which corroboration is required, the classic charge will carry the incongruity and possible hurt to which I have referred if the facts are such that the defendant must be guilty if the witness is guilty, see Annotation 19 *A. L. R. 2d* 1352, 1356 (1951), but still in such circumstances the defendant there gains a compensating advantage in that the jury is also

directed to acquit even if the witness is believed, unless corroboration is also found. But where, as in our State, corroboration is not required, the "accomplice" charge in that factual pattern carries the possibility of harm unameliorated by a further instruction to acquit if corroboration is not found. Hence in a jurisdiction in which corroboration is not required it is a mistake to demand the "accomplice" instruction routinely and without weighing the role it will play in a given setting.

The thesis of the "accomplice" charge is that, being already enmeshed, the witness, in the hope of leniency, may falsely involve another. Defendant's requested instructions were couched in those terms. As stated in 7 *Wigmore, Evidence* (3d ed. 1940), § 2057, *p.* 322:

> "The reasons which have led to this distrust of an accomplice's testimony are not far to seek. He may expect to save himself from punishment by procuring the conviction of others. It is true that he is also charging himself, and in that respect he has burned his ships. But he can escape the consequences of this acknowledgment, if the prosecuting authorities choose to release him provided he helps them to secure the conviction of his partner in crime: * * *. It is true that this promise of immunity or leniency is usually denied, and may not exist; but its existence is always suspected. The essential element, however, it must be remembered, is this supposed promise or expectation of conditional clemency. If that is lacking, the whole basis of distrust fails. We have passed beyond the stage of thought in which his commission of crime, self-confessed, is deemed to render him radically a liar (*ante,* § 426). The extreme case of the wretch who fabricates merely for the malicious desire to drag others down in his own ruin can be no foundation for a general rule."

The stated thesis of the rule quite obviously can apply only where the witness's guilt is consistent with defendant's innocence, for if *upon the truth* neither the witness nor the defendant is guilty of an offense, there can hardly be a motive to curry favor by false testimony. To the contrary, if *both* must be guilty or *both* innocent, the witness's testimony bears the badge of verity for it is against his own interests to give the damaging evidence. Hence a cautionary

instruction based upon the hope of favor makes sense only if the witness is guilty of some crime (whether or not the one described in the indictment) in circumstances in which the defendant may nonetheless be innocent. Such was the situation, for example, in *State v. Spruill,* 16 *N. J.* 73 (1954). As I have said, it is only in a jurisdiction in which corroboration is required, that a defendant can benefit from the cautionary instruction if the facts are such that the witness cannot be guilty unless the defendant too is guilty; and there the defendant does not benefit from a cautionary instruction based upon a hope of reward, but rather from the distinct instruction that even though the witness is credited, nonetheless there cannot be a conviction unless corroboration is found.

An instruction in the nature of the "accomplice" charge would here aid defendant only if a jury could find that the witness, although in truth innocent of crime, erroneously thought he was guilty and hence sought favor by telling a false story involving both the witness and defendant. There is no evidence in the case to support that theme, and the requests to charge were not framed upon it. Absent such circumstances, a cautionary charge could be suggested only upon the different thesis that a witness's confession of crime should affect credibility to the same extent as would a conviction. The difficulty again is that since the discrediting offense could not have been committed by the witness unless the defendant too was guilty of the crime with which he is charged, an instruction in that vein impales the defendant upon the same lance. *Cf. State v. Costa,* 11 *N. J.* 239, 256 (1952). Wigmore seems to reject this possible basis for a cautionary charge for other reasons in the closing portion of the quotation above. I need not express a view since defendant did not seek a charge upon that ground.

For these reasons, I believe the trial court merely complied with defendant's own requests. Frankly, I am at a loss to see how the trial court could so phrase an "accom-

plice" charge as to obviate the possible harm of which defendant complains. Perhaps, after further reflection, defendant will not renew his request at the retrial.

WEINTRAUB, C. J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.