Mary Catherine MILLAR, Appellant
(Defendant and Cross-
Plaintiff below),

v.

John W. MILLAR, Appellee (Plaintiff and
Cross-Defendant below).

No. 3035.

Supreme Court of Wyoming.

Feb. 20, 1962.

Lonabaugh & Lonabaugh, E. E. Lonabaugh, Sheridan, for appellant.

Henry A. Burgess, Sheridan, for appellee.

Before BLUME, C. J., and PARKER, HARNSBERGER and McINTYRE, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an appeal from a judgment of the District Court of Sheridan County, Wyoming, in which John W. Millar, a former British naval officer having emigrated to the United States and having settled in Sheridan, Wyoming, brought an action for divorce against Mary Catherine Millar, a resident of England. The parties will be named herein as in the court below. The plaintiff, John W. Millar, filed his complaint in the District Court of Sheridan County, Wyoming, on May 13, 1960, and alleged that he and his wife were married on the island of Malta on September 10, 1948; that plaintiff has resided in Sheridan County, Wyoming, for more than sixty days immediately preceding the filing of the complaint; that plaintiff and defendant have a son, David Bruce Millar, born on May 26, 1952, who is now attending school in England and is supported by the plaintiff who pays the fees and school charges and in addition thereto the sum of 100 pounds per annum; that plaintiff and defendant lived apart for two consecutive years without cohabitation without fault on the part of the plaintiff in whole or material part; that the complaint is not founded or exhibited by fraud or collusion between the parties; and that there was no property accumulated by the parties during their marriage. Plaintiff accordingly prayed for a divorce.

On July 25, 1960, service of the complaint having been had on the defendant, the latter appeared in the case and answered, alleging that the complaint failed to state a claim upon which the court might grant relief. As a second defense the defendant denied all the allegations of the complaint except the marriage, the birth of the son, and that the complaint was not filed pursuant to collusion or fraud of the parties. As a third defense the defendant alleged that the plaintiff had been guilty of adultery and indignities prior to and subsequent to the separation of the parties. On the same date the defendant filed a cross-complaint alleging that by order of the High Court of Justice in England she was awarded the custody of the child and that she supported the child in school; that defendant and plaintiff had lived apart for two consecutive years without cohabitation which was not due to the fault of the defendant; that by adjudication of the English court she was awarded alimony in the sum of 450 pounds until the child would reach the age of eighteen years and at the rate of 400 pounds per annum thereafter; that this amount is insufficient and should be raised; and that defendant had no funds to prosecute the action. She accordingly asked for a decree of absolute divorce and for the care and custody and support of the child and for the support of herself. The plaintiff filed an answer to the cross-complaint substantially denying the allegations therein. By agreement of the parties some depositions were taken of witnesses who lived in Eng-

land and these depositions have been duly returned and are a part of the record herein.

The parties herein subsequently alleged indignities as a ground for divorce but the trial court did not pass upon these allegations.

The case was tried before the court without a jury commencing on December 14, 1960. On December 27, 1960, the court entered its decree therein, finding that: Plaintiff had resided in Sheridan County for sixty days immediately preceding the filing of the complaint; he was a bona fide resident of the state, domiciled in Sheridan County, Wyoming; the court had jurisdiction of the case; plaintiff and defendant had lived apart for more than two consecutive years without cohabitation; the separation commenced on May 3, 1957, and continued to the date of the action herein and such separation was not induced nor justified by cause chargeable to the plaintiff; there was born to the parties on May 26, 1952, a son named David Bruce Millar; defendant should have the care and custody of the child except that the plaintiff should have the right of visitation and a right to control and custody of the child during four weeks of the school vacation; plaintiff should pay the defendant for the support and maintenance of the son in the sum of $280 per annum payable in equal monthly payments; plaintiff was required to keep in effect a Yorkshire Insurance Company policy and a North British and Mercantile Company policy in which the son should be designated as beneficiary; however, the Sun Life Insurance Company policy should be surrendered by the plaintiff forthwith and all benefits received therefrom should be applied by the plaintiff to current and future educational costs incurred and to be incurred in the education of the son; and plaintiff had been an officer in the British navy and received certain benefits upon his retirement from the service in March 1959. The court held that plaintiff should be required to pay to the defendant the sum of $5,867, which sum is approximately one-half of the amount acquired by the plaintiff during the years of cohabitation and is a fair, equitable and just division of the funds accumulated during the marriage of the parties. In that connection, the court provided that the payment:

"* * * shall be a full, final and complete settlement of all rights of the Defendant in and to the estate of the husband, including a full, final and complete settlement of any right to permanent alimony. That any payments made after the date hereof by Plaintiff to Defendant under a Decree of a Court of foreign jurisdiction shall be applied upon the sum of $5,867.00 due and payable as above provided. The Plaintiff should pay the sum of $5,-867.00 unto the Clerk of the District Court of Sheridan County, Wyoming, within 35 days from the date hereof, which sum shall be paid by the Clerk of this Court unto the Defendant upon satisfactory evidence being furnished by her to said Clerk showing compliance by her with the provisions hereof.

* * * * * *

"* * * she should forthwith apply for a cesser and termination of all rights, claims or demands against the Plaintiff which she might have by reason of her marital relationship with the Plaintiff, and the Plaintiff should not pay nor be required to pay over unto the Defendant any amount other than is herein provided, and then only when such order of cesser is entered in the court of foreign jurisdiction in the action between these parties."

The firm of Lonabaugh and Lonabaugh was awarded the sum of $750 as counsel fees, $500 of which has heretofore been paid, the balance of $250 to be paid within ten days of the entry of the decree. The decree further provides that the sum of $227 should be paid to Lonabaugh and Lonabaugh for the costs incurred by an English barrister and solicitor in taking the depositions herein, and the court further award-

ed the sum of $54 to the defendant for traveling expenses from England. From the decree so entered in this case the defendant has appealed to this court.

### 1. Jurisdiction.

Counsel for defendant contend that under the evidence herein it has not been shown that the plaintiff, appellee herein, was a bona fide resident of Wyoming for the period of sixty days before applying for a divorce as required by § 20-48, W.S.1957, and that hence the court had no jurisdiction to grant the divorce. We agree with counsel that in order that the court may have jurisdiction to grant a divorce to the plaintiff his residence in this state must have been for the purpose of at least remaining here indefinitely and that his residence must be with the bona fide intention of making Wyoming his home. 27A C.J.S. Divorce § 76, p. 268. The evidence herein shows that the plaintiff was born in England and came to the United States in March 1959. He became an employee of the Sun Life Insurance Company in Washington, D. C., selling insurance of that company on commission. While in Washington he applied for citizenship of the United States and on March 8, 1960, he moved to Sheridan, Wyoming. While in Sheridan he obtained a license to sell insurance in Wyoming. He notified the immigration authorities of his whereabouts. He obtained an apartment in Sheridan and opened up his office in the Kutcher Building. He advertised his business by radio and by press and in fact sold some insurance. He sold his real estate (a flat) in England. He obtained a Wyoming driver's license and stated his intention to make his home in Sheridan. He was asked:

"Q. Where is your home in the United States? Where is your home? A. In Sheridan.

"Q. And do you intend to make it your home? A. I do."

On cross-examination he was asked:

"Q. Now, it's true that you came out here to Wyoming for a divorce, is it not, Mr. Millar? A. Well, that's an ambiguous question. I came out to Wyoming because I've always wanted to see the wild west. And I met Keith Thompson and the Ewings out in Washington and they told me all about Sheridan. And there were a variety of reasons why I came here. I had never been out west before and I did want to come."

It is contended that the court erred in excluding some offered testimony. The plaintiff was asked whether or not it was true that while he was in Washington, D. C., he consulted an attorney relative to divorce laws of various states. The evidence was excluded as immaterial. He was also asked, "But you have made a public statement, have you not, that the divorce laws of Wyoming coincided with your desire to see the west?" The objection to this question also was sustained. The thought of the learned counsel for defendant seems to be that when a person who seeks a divorce selects a state in which the divorce laws are liberal, that itself is a suspicious circumstance which shows that the person is not intending to make that state his permanent residence. We are inclined to believe that counsel are mistaken in that contention. If it were valid, our legislature may as well repeal the law as to the requisite of only sixty days' residence. It may be added that the city of Sheridan with its beautiful valleys and the neighboring majestic mountains is sufficiently attractive and alluring for a person to desire to make that city his permanent residence and carry on his vocation in that place. No apology for selecting Sheridan as one's abode is necessary.

The plaintiff was asked:

"Q. Now, you have no intention of staying in Wyoming after this divorce is granted, do you? A. I'll not make any prophecy as to the future. Again I will say that the insurance agents, when they break into a new area, or try to, they never know how well they will do; and there's an enormous float-

ing population. My mind is totally not made up and it depends a lot on whether I have any success here."

Counsel for defendant seem to think that this answer shows that plaintiff was not a bona fide resident of Wyoming. We do not think so. All of plaintiff's testimony must be considered. The mere fact that plaintiff did not want to make a prediction as to what might happen in the distant future did not contradict his testimony that he was a resident of Sheridan and intended to make that city his home. It is stated in 27A C.J.S. Divorce § 76, p. 269, as follows:

"* * * Where the change of domicile is real, the fact that it is motivated by a desire to take advantage of the state's divorce laws is not material; the motive for a change of domicile is immaterial, unless it is for the sole purpose of securing a divorce with no intention of making the state his permanent home.

"As affecting jurisdiction, in general, an existing domicile continues until another is acquired, and, where plaintiff is an actual resident of the state at the commencement of the action, his right to maintain the suit is not lost because he intends at some future time to remove from the state. * * *"

Mary S. Gwinn testified that the plaintiff told her at the home of Mr. Lonabaugh (where she apparently worked) that he intended to marry a girl in England, and she attempted to infer that he intended to return to England and live there. Plaintiff was asked about this conversation. We need not set out his testimony in detail. He substantially denied the woman's testimony and the court was entitled to believe him.

Counsel for defendant also refer to the testimony of defendant that plaintiff stated to her in September 1957 that he would obtain a divorce even if he had to move to New Mexico. That merely confirms the intention of the plaintiff to have a divorce and does not seem to have any bearing on the question of whether or not he was a bona fide resident of Sheridan.

Whether or not a person has his domicile or residence in a particular place within the meaning of the law applicable herein is a question of law and of fact to be determined from the facts and circumstances of each particular case. 27A C.J.S. Divorce § 76, pp. 263, 264. We think that the facts and circumstances in this case are such that the trial court was justified in finding that the plaintiff had resided in Wyoming more than sixty days prior to the commencement of this action and that he intended to make Sheridan his permanent residence. The trial court had jurisdiction in the case. The contention of counsel for defendant in this connection is accordingly overruled.

2. Cause of separation.

Section 20–47, W.S.1957, provides that a divorce may be granted "When the husband and wife have lived apart for two consecutive years without cohabitation but not upon such ground if such separation has been induced or justified by cause chargeable in whole or material part to the party seeking divorce upon such grounds, in the action." That the plaintiff and defendant did not cohabit for more than two years when the action herein was brought is not disputed, so the only question remaining is as to whether or not plaintiff is chargeable with causing the separation. That the statute means more than cruelty and indignity was stated in Jegendorf v. Jegendorf, 61 Wyo. 277, 157 P.2d 280. It was held in Dawson v. Dawson, 62 Wyo. 519, 177 P.2d 200, and Stinson v. Stinson, 70 Wyo. 351, 250 P.2d 83, that the burden to show that the applicant for a divorce is chargeable for causing the separation of the parties is on the defendant. Counsel for the defendant construe the testimony in this case quite differently from the construction put upon it by counsel for the plaintiff and by the trial court. Learned counsel, including the learned counsel for the defendant herein, at times forget the rule announced in Willis v. Willis, 48 Wyo. 403, 49 P.2d 670, 678, Id., 49 Wyo. 296, 54 P.2d 814, and many times thereafter, that "the

appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." This rule is particularly applicable in the case at bar for the reason that in all important respects the testimony of the plaintiff and for the plaintiff is entirely contradictory to the testimony given by the defendant and in her behalf. We must further remember that the credibility of the parties rests with the trial court and it is not compelled to give credit to everything testified to by a particular party. We also held in Stinson v. Stinson, supra, at 250 P.2d 87, that "Obviously what plaintiff did after the separation was an accomplished fact does not establish that the fault causing the separation can be laid upon the plaintiff's shoulders."

It would perhaps be best to follow what was said in the Jegendorf case that to discuss the conduct of the parties during their marriage subserves no good purpose, but counsel for the defendant herein might not be satisfied if we followed that course so we shall give a brief outline of the causes leading to the present action without casting undue reflection upon either of the parties.

The plaintiff was a lieutenant in the British navy. The personnel of the navy was being reduced and retirement of officers was encouraged so plaintiff retired in the spring of 1959 as a lieutenant commander. As a naval officer plaintiff was required to travel to various parts of the world, and during the years from 1949 to 1957 the parties herein lived together for only thirty-seven months. They were married in Malta in 1948. Thereafter for a time they lived in Portsmouth. About 1950 the plaintiff was appointed as an instructor in military affairs at Cranwell, England, and stayed there for about two and a quarter years. The defendant admitted that they had their differences and attributed it in part to the fact that both of the parties hereto were colorful characters. As early as November 1951 they had come to an impasse and the sister of the defendant explained that by writing to the plaintiff as follows:

"Mary was not built for marriage. She is such an individualist, priding herself on being as hard as nails, always going her own way, that I knew you would both have to work pretty hard to make a go of marriage; however, after meeting you once or twice and liking you, I really thought Mary could not help but be happy with you and be willing to sacrifice her freedom to make you happy too."

The defendant had belonged to a club called the "Heifers" composed of young women connected with the navy who vowed that they never would get married, and defendant admitted in her testimony that in her younger years her disposition was rather one of independence. Plaintiff testified that he and his wife talked about separation almost from the beginning of their marriage, and that defendant was always in favor of separation, though not for divorce, perhaps thinking of the fact that under English law separation itself was no ground for a divorce. According to the testimony of plaintiff's mother, defendant stated that she got married only so that she might have security later in life. Plaintiff and defendant lived for a few months in the neighborhood of Cranwell where the plaintiff was stationed. The defendant found herself with child in July 1951, was incensed at that, went to London and stayed there until two months after the child David was born in the spring of 1952, even though there were physicians near Cranwell. During that time plaintiff wrote a number of letters to the defendant concerning reconciliation. There is testimony in the record that defendant never seemed happy about her marriage; that nothing that the plaintiff did seemed to her to be right; that she nagged him about it all the time; that she nagged about the things he said, the way he did things; that she said he was not going to be good for any-

thing; that he would not make good and he would never become a commander; that he would not get promotions the way others did; and that she always complained about the meagerness of his salary. Plaintiff's mother characterized defendant as a "nagger".

On May 3, 1957, the parties entered into a written agreement of separation. Plaintiff agreed to pay her during the first year thirty-three pounds a month and six and a half pounds as rental for the flat to which the defendant had moved. Payments after that time were to be as the parties might agree. Plaintiff also agreed to pay the cost of a secretarial course for the defendant for the period of six months, presumably for the purpose of enabling the defendant to make a living for herself. Apparently she took this course, being engaged in secretarial work at the time of the trial in this case. Shortly before the separation agreement, plaintiff's mother at the instance of plaintiff went to see the defendant for the purpose of reconciling the parties if possible. She testified that the defendant refused any reconciliation and said that she wanted to get rid of the plaintiff. The mother stated that the plaintiff had been good to the defendant and that defendant had no reason for separation. The defendant suggested that if plaintiff would furnish her with grounds for divorce she would procure one, even though she was a Catholic; and that the interest of the child did not matter since many children had been brought up without seeing their father. The foregoing suggestion was also made to plaintiff who in fact furnished the defendant with the grounds for divorce under English laws, but, as plaintiff testified, the defendant instead of getting a divorce "double-crossed" him and got a decree of separation instead. A copy of the decree is in the record before us. When the petition was filed does not appear. The decree is dated January 18, 1960. It provided for the separation of the parties and gave the custody of the child to the defendant. Plaintiff emigrated to the United States in March 1959. When plaintiff was on board

ship, defendant sent him a farewell greeting. She appended a note, pathetic in a way, which stated: "I hope you will enjoy God's own country. Am sure it is all for the best for all of us. As far as I am concerned it has all been worth it because of David—so thanks for him anyway." The defendant at that time knew that the parting of the parties was permanent, and she knew that the plaintiff would attempt to get a divorce because he had told her so. In view of the foregoing statement of defendant, it is not quite clear why she soon thereafter bitterly contested the action for divorce brought by the plaintiff.

Plaintiff was examined at great length about some women with whom he had associated, some of them before the separation and some thereafter. The defendant also testified on the subject. Plaintiff, for instance, was examined in connection with his association with one Susan Hickson who belonged to the navy, and he testified that he met her first on the Solebay and saw her again later on board the H. M. S. President and that he went out with her three or four times. He was also asked about Jean Moles, who was the wife of a naval officer who was a friend of the plaintiff. He was asked whether he spent considerable time with her. The answer was, "No, I didn't spend considerable time with her." The question was asked, "You spent some time with her when her husband wasn't there, did you not?" The answer was, "Well, again, in the Navy it often happens that one's wife insists on living in London when one is living in Portsmouth. You're not going into a monastery; life goes on as usual. And, so, I did see her several times, yes." He testified that he spent the weekend at her house occasionally but only when her husband was present. Again he was asked, "It was quite a common thing for you to go out with another woman during your married life, was it not?" The answer was, "With my wife not there. I certainly didn't go and shut myself up on my ship." It would seem unnecessary to pursue this subject any further. The court evidently held that the conduct of the plain-

tiff was not dishonorable or did not influence the separation, or both, and we are unable to hold the contrary.

There was also some testimony on the part of the defendant that she had attempted a reconciliation in December 1958. Plaintiff testified that the attempted reconciliation was not in good faith.

The question as to whether or not the plaintiff was at fault in causing the separation between the parties was largely a question of fact. The court resolved that question against the contention of the defendant and we are unable to say that the court's conclusion was not correct, particularly in view of the fact that the burden of showing plaintiff's fault was on the defendant.

### 3. Custody of child.

Counsel for defendant contend that the court erred in changing the custody of the child. Such custody was awarded to the defendant by the English court as heretofore mentioned. The trial court in the present action provided that plaintiff should have the right of control of the child during four weeks of the school vacation months in each year. Counsel for defendant argue that according to Laughton v. Laughton, 71 Wyo. 506, 259 P.2d 1093, 43 A.L.R.2d 351, it was the duty of the plaintiff to show that there was a change of circumstances since the English court awarded the custody of the child to the mother and to show that it is for the welfare of the child that such change should be made. They argue that the child is in a boarding school in England as is customary there and that he would see his mother only during the summer holidays. Just how long the vacations are in England we do not know. Still there can be scarcely any doubt that even though the child were in boarding school, the defendant, living in London, would be able to see the child from time to time and keep in contact with him. Since the English court awarded the custody of the child to the mother, the plaintiff has moved to Sheridan, Wyoming. The court awarded him a divorce whereas the Eng-

lish court merely provided for a separation. We think these circumstances are sufficiently different from the circumstances as they were when the plaintiff in this case also lived in London. Nor can there be any doubt that it is for the best interest of the child to see his father from time to time. If he did not do so, he might in later life come to hate his mother for preventing him from seeing his father at all. The decree in this case is simply a decree that is very common, at least in this country, namely that the father as well as the mother should be able to see the child from time to time. We are inclined to think that the trial court's order should be sustained. It seems that at the time of the trial in this case the child was in England. Perhaps he is still there. Whether or not the English courts would recognize the decree in this action need not be determined. See in that connection the Annotation in 20 A. L.R. 820.

### 4. Division of property.

Counsel for defendant complain that the court did not make a fair division of the property of the parties. Their argument in this case is hardly a fair presentation of the facts herein. They cite a number of cases involving the fact that the husband has a large income or a potentially large income. These cases are hardly in point herein. The plaintiff has no profession. He is not a mechanic. He is attempting to build up a business selling life insurance on commission. To build up a business of that sort is not an easy task in a highly competitive field. It takes time, patience and persistence to make the business lucrative. Whether or not the plaintiff has that patience and persistence we do not know, and it is pure conjecture as to what his business will be in the future. Ironically, counsel for defendant, when referring to the question of jurisdiction, referred to the fact that he had sold only four policies. Now they use that same fact to show the potential earnings of the plaintiff. Counsel complain that the court did not take into consideration the value of the life insurance of the plaintiff. That is not correct.

The court took that into consideration. It is to be used for the education of the son of the parties. Exhibit 10 shows that the net earnings of the plaintiff for eleven months of 1960 was $1,087. Exhibit 8 shows the assets of the plaintiff, less liabilities, to be $20,428. The defendant was awarded $5,867. After paying $250 to counsel for the plaintiff, $227 for solicitors in England, and $54 to defendant, the plaintiff would have approximately $14,000. The defendant, in addition to the allowance herein, has property of the value of $7,000. If counsel for the plaintiff is entitled to the same amount of counsel fees as has been awarded counsel for the defendant, he would have quite a little less property than the defendant herein. Let us quote what we said in Boschetto v. Boschetto, 80 Wyo. 374, 343 P.2d 503, 506, as follows:

"* * * Inasmuch as a trial court's judgment cannot be disturbed except on clear grounds, we have seldom interfered with the action of the trial courts and whenever we have done so we have interfered only to a very limited extent. It is readily seen that unless we adhere to that course we should be apt to have before this court a plethora of appeals in divorce cases involving a division of property and asking us to virtually constitute ourselves as a court of the first instance to divide the property. We do not think that that is the function of this court."

Applying that rule in this case, we are not in a position to say that the trial court abused its discretion.

5. Counsel fees.

Counsel for defendant complain that the trial court did not allow counsel fees for Mr. Crane, the solicitor in England employed by defendant, and they also apply for an allowance of $750 for counsel fees on this appeal. The question as to what should be allowed to counsel is necessarily a difficult question and it is not an easy task to determine what is just. It does not necessarily depend on what is the value of the work of counsel. The question depends to a large extent on the circumstances of each case. The matter is largely in the discretion of the court. 27A C.J.S. Divorce § 220. The right of the wife to counsel fees is not an absolute right in the absence of a statute and we have no such statute. 27A C.J.S. Divorce § 216, p. 936. In some jurisdictions the wife is not entitled to counsel fees when she appeals a divorce case. Pearson v. Pearson, 179 Ill. App. 127. The financial ability of the husband to pay must be considered. 27A C.J.S. Divorce § 222, pp. 969, 973, and § 224, p. 983. Whether or not the wife is entitled to more than one counsel is a matter of judicial discretion. 27A C.J.S. Divorce § 224b. In the case at bar, the trial court decided that the solicitor in England should not be awarded any counsel fee. As a matter of fact, he could hardly be of assistance in a case pending in the courts of Wyoming and we cannot say that the court abused its discretion. The plaintiff's ability to pay is small as heretofore noted. He is entitled to live the same as his wife and her counsel. He must pay his own counsel as well as counsel for the defendant. In fact, noting his income for 1960, it may well be that he will be compelled to sell some of the little property that he still has in order to live. By direction of the court he is compelled to pay counsel fees of approximately $1,000. Taking into consideration the facts and circumstances, we do not think, as may be noted from our discussion herein, that this appeal is sufficiently meritorious to justify this court to allow any more counsel fees to counsel for the defendant. The judgment of the trial court herein is affirmed.

Affirmed.