David McLAUGHLIN, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5238.

Supreme Court of Wyoming.

April 1, 1981.

---

Michael H. Schilling, Appellate Counsel, Public Defender Program, Laramie, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Laramie, and Fred R. Dollison, Student Intern, Wyoming Defender Aid Program, Laramie, for appellant (defendant).

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division, and Gay Vanderpoel, Asst. Atty. Gen., Cheyenne, for appellee (plaintiff).

Before ROSE, C. J.,* and McCLINTOCK, RAPER,** THOMAS and ROONEY, JJ.

THOMAS, Justice.

We are confronted in this case with a novel question in Wyoming. What is the criminal responsibility of a person who is employed in an enterprise that serves as the matrix of a criminal conspiracy but whose activities consist of acts that would be lawful in the absence of the conspiracy and whose commitment to the conspiracy must be inferred from circumstantial evidence? The question is posed by an attack upon the sufficiency of the evidence to support the jury's verdict of guilty.

David McLaughlin was charged by information with one count of conspiracy to obtain money by false pretenses, as defined in § 6–3–106, W.S.1977 [1] in violation of § 6–1–117, W.S.1977 [2]. He was convicted after a trial to the jury, and he was sentenced to serve 12 to 18 months in the State Penitentiary. We shall affirm his conviction.

The sole issue presented by McLaughlin is stated in his brief as follows:

"Whether it was error for the Trial Court to deny Appellant's Motion for Judgment of Acquittal made at the close of the State's case in chief per Rule 30(a), W.R. Cr.P."

This statement of the issue is expanded in the appellant's summary of argument, which is stated in his brief in this way:

"Since there was introduced at trial no evidence sufficiently connecting appellant to the alleged conspiracy, by which a jury could reasonably conclude appellant's guilt, it was error for the trial court to deny Appellant's Motion for Judgment of Acquittal."

The position of the State of Wyoming is that the Motion for Judgment of Acquittal

---

* Chief Justice since January 5, 1981.

** Chief Justice at the time of oral argument.

1. "If any person or persons shall knowingly and designedly, by false pretense or pretenses, obtain from any other person or persons any choses in action, money, goods, wares, chattels, effects, or other valuable thing whatever, with intent to cheat or defraud any such person or persons of the same, every person so offending shall be deemed a cheat, and upon conviction, where the value of such chose in action, money, goods, wares, chattels, effects or other valuable thing shall be twenty-five dollars ($25.00) or more, shall be imprisoned in the penitentiary for a period not more than ten (10) years. In all cases where the value of such chose in action, money, goods, wares, chattels, effects or other valuable thing is less than twenty-five dollars ($25.00), the person so offending shall be punished by a fine not to exceed one hundred dollars ($100.00), or by imprisonment in the county jail not more than six (6) months. In either case under this section he shall be sentenced to restore the property so fraudulently obtained if it can be done."

2. "If two (2) or more persons conspire to (a) commit a felony in the state of Wyoming or to commit an act beyond the state of Wyoming which if done in this state would be a felony, and (b) one (1) or more of such persons do any act, within or without the state of Wyoming, to effect the object of the conspiracy, each, upon conviction, shall be fined not more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years or both. A conspiracy may be prosecuted in the county where the conspiratorial agreement or combination was entered into, or in any county where any act or acts evidencing the conspiracy or in any county wherein the furtherance of its purpose took place."

should be granted only where there is no evidence which would support a guilty verdict, and it argues that in this instance the determination that there was sufficient evidence was properly made within the sound discretion of the trial judge.

In *Jasch v. State*, Wyo., 563 P.2d 1327, 1332 (1977), this court adopted the following definitions pertaining to conspiracy:

"A conspiracy is an agreement between two or more persons to do an unlawful act. The crime of conspiracy is complete when an agreement has been made and overt acts performed to further the unlawful design. * * * "

In his brief the appellant very candidly concedes that the record discloses all of the elements of a conspiracy. He says, "There is a veritable mountain of evidence supporting the State's contention that there did exist between February, 1977 and November, 1978 in Carbon County, Wyoming, a conspiracy to fraudulently sell automobile parts to unwary travelers." We wholeheartedly agree that this record manifests a vicious scheme to sell to members of the public tires, alternators, shock absorbers, and fan clutches to replace similar items which were functional and did not need to be replaced. Various employees of several filling stations in Carbon County, Wyoming, all of which were operated by one Dave McCracken, were involved in this fraudulent scheme. They were paid on the basis of $2.00 per hour plus 50 percent of the cost of any parts they succeeded in selling.

Differing methods were used to mar tires on vehicles, and these purported defects then were called to the attention of the operator of the vehicle who was persuaded that the tire was defective and needed to be replaced. Oil would be sprayed around shock absorbers, and the operator of the vehicle then would be persuaded that this manifested a failure of the shock absorber which needed to be replaced. Fan clutches were manually manipulated in such a way that they appeared to be defective, or fluid

was sprayed on them and the representation made that the seals were leaking and the part needed to be replaced. As to alternators, a substance called liquid smoke, intended for use in barbecue cooking, would be sprayed on the alternator which then would smell as though the wires were overheated and burning. There then followed the obvious suggestion that the alternator needed to be replaced. Once an alternator or fan clutch had been sold to a motorist, the purportedly defective part would be cleaned by sandblasting, or repainting, or both, and it then would be sold as a rebuilt part to the next victim who needed a similar part. Apparently the marred tires and the used shock absorbers were not resold.[3]

While work orders apparently were maintained in these several businesses, some of the other record keeping was less formal, and the employees were usually paid in cash at the end of each shift for their $2.00 per hour plus 50 percent of whatever parts were sold. One of the principals explained that this was done so that if anyone had to leave in a hurry he was not owed money.

■ The question then to be resolved is whether the evidence is sufficient to support the jury's finding that McLaughlin was a participant in this criminal conspiracy. No issue is taken with any instructions of the court upon the crime of conspiracy. The essence of the issue posed by this appeal was presented to the jury in the instructions of the court as follows:

"It is necessary, however, to prove beyond a reasonable doubt that a defendant was aware of the common purpose and was a willing participant in the conspiracy."

The court also properly instructed the jury that in its deliberations it could weigh circumstantial evidence equally with direct evidence. These instructions express the rules generally applied by the courts with respect to individual participation in a conspiracy. Once the conspiracy is established, and we reiterate that the fact of the conspiracy is

---

**3.** The evidence concerning the fraudulent scheme is set forth in much greater detail in the concurring opinion.

admitted here, knowledge of the conspiracy alone or, as this instruction notes, awareness of the common purpose will not be sufficient to convict the defendant. *United States v. Laughman,* 618 F.2d 1067 (4th Cir. 1980), *cert. den.,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980); *United States v. Richardson,* 596 F.2d 157 (6th Cir. 1979); *United States v. James,* 510 F.2d 546 (5th Cir. 1975), *cert. den., Vasquez v. United States,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *United States v. Edwards,* 488 F.2d 1154 (5th Cir. 1974); *State v. Salazar,* 27 Ariz.App. 620, 557 P.2d 552 (1976); and *Commonwealth v. Gill,* 5 Mass. App. 337, 363 N.E.2d 267 (1977). The defendant must intentionally take part in or actively participate in the conspiracy as well. *United States v. Laughman,* supra; *United States v. Richardson,* supra; *United States v. James,* supra; *United States v. Edwards,* supra; *State v. Salazar,* supra; *State v. Roberts,* 223 Kan. 49, 574 P.2d 164 (1977); *Commonwealth v. Schoening,* —— Mass. ——, 396 N.E.2d 1004 (1979); *Commonwealth v. Gill,* supra; *People v. Huey,* 345 Mich. 120, 75 N.W.2d 893 (1966); *State v. Carbone,* 17 N.J.Super. 446, 86 A.2d 259 (1952), *affirmed,* 10 N.J. 329, 91 A.2d 571 (1952); and *State v. Gilman,* 110 R.I. 207, 291 A.2d 425 (1972). In the foregoing instruction this concept is expressed by the advice to the jury that the proof must establish that McLaughlin was a willing participant in the conspiracy. These matters may, and in most cases must, be established by circumstantial evidence. In addition to the cases cited above, see e. g., *People v. Haskin,* 55 Cal.App.3d 231, 127 Cal.Rptr. 426 (1976); *United States v. Thomas,* 468 F.2d 422 (10th Cir. 1972); and *People v. Britz,* 17 Cal.App.3d 743, 95 Cal.Rptr. 303 (1971).

■ In this instance, as is usually true with respect to the crime of conspiracy, the participation of McLaughlin must be inferred from circumstantial evidence. He was present on one occasion when McCracken, the chief figure in the conspiracy, discussed fraudulent sales techniques. With that one exception there is no direct testimony that McLaughlin knew of the common purpose of the conspiracy, and with respect to his being a willing participant the testimony in some respects could lead to a conclusion that he did not participate. That testimony, however, is fairly limited to the substantive crime of false pretenses, and it is not necessary to a charge of conspiracy that the defendant actively participate in the substantive crime which is the object of the conspiracy. *Curry v. Superior Court of San Diego County,* 7 Cal.App.2d 836, 86 Cal.Rptr. 844 (1970).

■ The record does disclose that McLaughlin worked with one of the conspirators, who was granted immunity for his testimony, at Dave's Standard Service Station in Rawlins from July 1976 until February of 1977. This period of time antedates the period of the charged conspiracy, but testimony relating to this earlier period was not the subject of any objection at the trial. In February of 1977 McLaughlin began managing Dave's Standard Service Station. The duties of a manager included watching the salesmen and making sure that they didn't get into the cash box. McLaughlin also worked at the Outpost Chevron in eastern Carbon County for several days while its regular manager was absent on his honeymoon. From September 1977 through the balance of the time charged in the conspiracy, McLaughlin served as the night manager of the 18th Street Chevron Station. The evidence relative to sandblasting was especially pertinent. McLaughlin knew of the purpose for sandblasting automobile parts in the several McCracken stations. The practices briefly discussed earlier in this opinion were so prevalent at the McCracken stations that the jury would be justified in inferring knowledge of these unlawful activities on the part of anyone who was present and employed in the capacities that McLaughlin was.

McLaughlin was paid $2.00 an hour plus a 50 percent commission on all parts that he sold. This was the identical compensation arrangement made with all other salesmen. He sold one fan clutch and one alternator while he was employed at the Outpost Chevron, and the regular manager of the

Outpost Chevron testified that the alternator would have been one of those which had been removed from a victim's automobile and either sandblasted or refinished. McLaughlin spoke of purchasing a welder's mask in order to protect his eyes and other parts of his head from the particles that were generated by the sandblasting operation. On one occasion he signed an invoice which represented the purchase of glass beads which were used in sandblasting the automobile parts. The duties of a manager included among other things that he was to "run interference" for the salesmen and to keep supplies and parts available at the station so that they would have something to sell. The manager would fill in as a salesman wherever he could.

On the basis of this evidence the jury was justified in inferring that McLaughlin was an active and willing participant in the conspiracy. As some authorities say, once the illegal conspiracy has been established, only "slight evidence" is required to connect an individual defendant with the conspiracy. *United States v. Petersen*, 611 F.2d 1313 (10th Cir. 1979); *United States v. Richardson*, supra; and *United States v. Chambers*, 382 F.2d 910 (6th Cir. 1967). Other authorities indicate that this must, however, be more than a scintilla of evidence, and the State must produce evidence which if believed affords a substantial basis in fact from which the defendant's guilt can be inferred. *United States v. James*, supra.

We conclude that the record in this instance discloses evidence justifying the jury in the dual inference that McLaughlin knew of the conspiracy to fraudulently sell parts to motorists which they did not need and that he was a willing and active participant in the conspiracy.

The judgment of conviction is affirmed.

McCLINTOCK, Justice, specially concurring in the conviction, in which ROSE, Chief Justice, joins.

I am in agreement that the conviction in this case should be sustained, but I reach that conclusion through a substantially different approach that rejects certain basic conclusions of the majority. I accept their definition of conspiracy as "an agreement between two or more persons to do an unlawful act." I also agree with them that even though the existence of a conspiracy is admitted, as appellant's brief concedes, knowledge or awareness "of the common purpose will not be sufficient to convict the defendant" since he "must intentionally take part in or actively participate in the conspiracy as well." Finally, I agree that evidence of such knowledge and intent need not be established by direct evidence, but the "State must produce evidence which if believed affords a substantial basis in fact from which the defendant's guilt can be inferred." Of course, we all agree that guilt must be proved beyond a reasonable doubt. The majority, after a brief, and to me far too cursory, summary of the evidence, conclude that it was sufficient. They reach a proper result but I think on too superficial a basis. I therefore feel impelled to record my own views.

I confess initial astonishment upon reading this statement in the opinion:

" . . . As some authorities say, once the illegal conspiracy has been established, only 'slight evidence' is required to connect an individual defendant with the conspiracy. . . ."

A number of cases are cited for this proposition and my own research found many others stating the principle in virtually the same language. My quest was to determine how it was possible for courts in conspiracy cases to permit a much lesser standard of proof than applied in ordinary criminal prosecutions. I am indebted to Judge Ely of the United States Court of Appeals for the Ninth Circuit for an enlightening analysis of this "slight evidence" rule and a sensible restatement thereof. I can do no better than quote from his opinion in *United States v. Dunn, et al.*, 9 Cir., 564 F.2d 348, 356 (1970):

"It is sometimes said, as the Government here states in its brief, that ' "[O]nce the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with

it",' quoting from *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969), which in turn quotes from earlier cases. We confess to having repeatedly proliferated, although we did not initiate, this statement, a principle that has become part of the cant in conspiracy cases. The litany is highly misleading if taken out of the context of the particular cases in which it was made ... So taken, *and construed to imply that participation in a criminal conspiracy may be proved by evidence that would be inadequate to prove the commission of some other criminal act*, the so-called 'slight evidence rule' would vitiate the Government's ever-present burden of proof, the requirement that guilt must be proved to a moral certainty and beyond a reasonable doubt, the presumption of innocence, the rule that all doubts must be resolved, and equally plausible inferences drawn, in favor of defendants, and other traditional foundations of our nation's system of criminal justice." (Emphasis added.)

Judge Ely then again quotes from *United States v. Knight*:

"'It is sufficient if the acts and conduct of a defendant were of such character that the minds of reasonable men could conclude therefrom that an unlawful agreement or understanding existed, and that the defendant, with knowledge of the existence of the unlawful enterprise, acted to further it.'" (564 F.2d at 356),

and continues:

"Conspiracy in the criminal law, as defined by the relevant statutes, is a crime. Those *knowingly* participating in the conspiracy in any respect or to any degree are guilty of that crime, but their guilt must be established under the same standards applicable to those charged with any other crime—neither more nor less—and the sufficiency of the evidence is subject to the same standards of review.

"Accordingly, we think it appropriate here to restate the slight evidence rule correctly and as we are reasonably certain that our predecessors intended it: Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy. Thus, the word, 'slight' properly modifies 'connection' and not 'evidence.' It is tied to that which is proved, not to the type of evidence or the burden of proof." 564 F.2d at 356–357. See also *United States v. Alvarez*, 5 Cir., 548 F.2d 542, 544 (1977).

This statement of the rule makes sense to me and I then pose the problem before us in this way: It being admitted that a conspiracy existed in this case, but accepting (a) the presumption of innocence and the burden of the State to prove guilt beyond a reasonable doubt, and (b) the principle that all doubts must be resolved and equally plausible inferences drawn in favor of the defendant, has the State shown a connection between the defendant and the conspiracy, even though slight?

The majority cite only one instance which they consider direct evidence of knowledge or complicity. They state as fact that defendant was "present on one occasion when McCracken, the chief figure in the conspiracy, discussed fraudulent sales techniques." They make this unjustified finding of fact by using the language of the question rather than the answer. In his examination of Greenwood, whose participation in the conspiracy was admitted and who testified under grant of immunity, the prosecuting attorney asked whether there had been conversations involving the witnesses, McCracken and McLaughlin, "where Mr. McCracken was talking about *fraudulent* sales techniques?" He received an affirmative answer and after further foundation was laid asked:

"Now, a moment ago you said you had a conversation with Mr. McCracken and Mr. McLaughlin in the Outpost Chevron about *fraudulent* sales techniques? ...

And what was that conversation, Mr. Greenwood?",

to which Greenwood replied:

"Dave McCracken was telling us all how much money could be made on the driveway as long as we tried to sell. And he said try and sell anything because anything you sell, you're going to make money on."

I have italicized the word "fraudulent" in each of these questions to highlight the fact that the only place where that word is used or there is anything even remotely suggesting fraud is in the question itself. It is unfortunate that the repeated use of this suggestive and conclusory word went uncontested, but despite that oversight the fact remains that Greenwood never testified to any fact justifying a finding that McCracken and McLaughlin at any time were discussing fraudulent sales methods. Only the answer is evidence and it contains nothing that could not come out of the mouth of any legitimate businessman, encouraging his commission salesmen to enhance their sales to the mutual profit of both the owner and the employee.

I must also disagree with this conclusion reached by the majority:

"... The practices briefly discussed earlier in this opinion were so prevalent at the McCracken stations that the jury would be justified in inferring knowledge of these unlawful activities on the part of anyone who was present and employed in the capacities that McLaughlin was." 626 P.2d at 66.

The practices referred to, as testified to by Greenwood at some length, and to a lesser extent by Forest Butler, likewise testifying under grant of immunity, are summarized in very general terms in a 19-line paragraph of the opinion, without specifics and without reference to any evidentiary facts justifying the inference that the practices were so obvious to McLaughlin as to show knowledge and participation on his part.

It must be remembered that during the period from July of 1976 to November, 1978, which more than covers the time that McLaughlin could have been involved in any conspiracy, McCracken operated three service stations in Rawlins: Dave's Standard, which was in operation in July, 1976, when McLaughlin first came upon the scene, and was closed in September of 1977; El Rancho Standard, which was similarly in operation in July of 1976 and was closed down about the end of the summer of 1977; and 18th Street Chevron, which opened in February or March of 1977 and was operating in November of 1978. Outpost Chevron is near the Town of Elk Mountain, shown by official Wyoming maps to be some 40 miles east of Rawlins. It was started in February of 1977 with Greenwood as the manager and was operated until November of 1978. McLaughlin is not shown to have had any connection whatsoever with El Rancho Standard; he worked at Dave's Standard from July of 1976 to September of 1977, taking over the management in February of 1977; he worked at 18th Street Chevron in September and October of 1977; and was then gone from the state for an undetermined period and was back for a couple of months "before this thing started"—whatever "this thing" or whenever that time might be. He was present at Outpost Chevron for four or five days in late March of 1977 when he handled the sale of two fan clutches identified by specific invoices; he was there again on July 24, 1978, when he handled the installation of an alternator.

On direct examination Greenwood described at length, but in very general language, the wrongful sales methods claimed to have been used by employees of McCracken during the period between July of 1976 and November of 1978. He named 11 men other than McLaughlin who had been so employed, but except in two instances involving tires did not implicate any of them in the fraudulent techniques. He did not tie a particular salesman into a particular station at a designated time when McLaughlin was present in that station. He referred to the salesmen who were asserted to be engaging in dirty tricks as "they." Thus, he said that "they" would pin a tire or otherwise damage or convince

the owner of damage to a tire; "they" would manipulate a fan clutch in such a way that it would give off a loud noise indicating that it was no longer in working order; and "they" would squirt liquid barbeque smoke into an alternator to give the appearance that the wires were burning up inside. Outpost Chevron was the main arena for these activities, and in cross-examination this testimony was given:

"Q. All of these people we were talking about who used these techniques worked for you at the Outpost Chevron; is that correct?

"A. Yes.

"Q. And that's where the basis and the—of your knowledge as to them using these techniques?

"A. That's where I got my knowledge, yes, sir.

*   *   *   *   *   *

"Q. All right. Now as to Dave McLaughlin, he was never employed out there except for those five days?

"A. No, sir, other than—well, he'd fill in for me if I was going to take off and go fishing."

Greenwood then testified on redirect examination concerning practices at two other stations:

"Q. Mr. Greenwood, on cross-examination you indicated that your primary knowledge of fraudulent sales techniques occurred at the Outpost Chevron. Do you also know of fraudulent sales techniques being used at the 18th Street Standard [probably should be Chevron]?

"A. Yes, sir, I do.

"Q. And do you also know about fraudulent sales that have been made at Dave's Standard?

"A. Yes, sir, I do."

Again, there is no testimony as to the time or persons involved, or the sales methods that he claims to know were being used at these other stations. Nothing at all is said about operations at El Rancho Standard where 13 alternators and 23 fan clutches were seized under search warrant on March 14, 1979, a year and a half after McCrack-en's operation at the station had closed. I find nothing in the record that explains how these exhibits were tied into the McCracken operation, and certainly there is nothing that ties McLaughlin to them.

No attempt was made to show that McLaughlin was himself engaged in improper sales practices and in fact Greenwood testified that he was a clean salesman. This appraisal of McLaughlin was confirmed by Butler, one of the salesmen at Outpost, also testifying for the State under grant of immunity. I realize that in weighing the question of guilt, the jury is not compelled to give credit to everything testified to by a party. *Millar v. Millar*, Wyo., 369 P.2d 207, 212 (1962), but whatever is done with that testimony, in my opinion there is no evidence tying McLaughlin's presence at a particular station to a time when a particular salesman was engaged in his dirty tricks. McLaughlin had only brief contact with Outpost Chevron, which was the principal focus of Greenwood's testimony. As I have already pointed out, the record is blank as to what acts Greenwood may have observed at Dave's Standard or 18th Street Chevron. We are left in the dark as to the number of fraudulent sales achieved at any station.

What we have here is a great mish-mash of vague testimony about the sale of tires, shock absorbers, fan clutches and alternators, with no specificity as to dates, locations or the persons that were involved. First, Greenwood testifies to an unknown number of sales involving fraudulent techniques. Second, the jury is permitted to view 13 alternators and 23 fan clutches that were taken from El Rancho Standard, a service station with which the defendant had no connection. Third, it is shown that McLaughlin worked at three of the stations. Therefore, the majority conclude, it must have been evident to him that malfeasance was taking place. I simply cannot agree that these three separate and distinct blocks of evidence are sufficient to satisfy the burden of the State of proving beyond a reasonable doubt that McLaughlin was connected with the conspiracy, even if only slightly. The evidence falls far short of

establishing a situation so redolent with fraud that only a fool could have been unaware of it. Since I reject this easy conclusion of the majority, it then becomes necessary to consider any other specific evidence that might show McLaughlin's knowledge and participation in the scheme.

As to tires, Greenwood named six of the eleven salesmen who he said were involved in the sale of tires, but only two were identified as being involved in any specific wrongful acts. He testified that one man has used a "honker," described as a type of chisel or scraper that had been sharpened. He demonstrated the use of this tool but did not testify as to a specific sale wherein this man had used the instrument. The only specific tire rip-off related by Greenwood related to one Tony who had bragged about making an expensive and unnecessary tire sale to a group called the Ursuline Sisters. The sale was made at the Outpost Chevron just after Tony had arrived there in the summer of 1977, and there is no showing that McLaughlin was around the station at the time or was in any way apprised of the sale. Nor was it shown that McLaughlin had ever used a honker. Greenwood had never seen him use one. The prosecutor's attempt to tie McLaughlin to fraudulent sales of tires was pretty well blown up when Greenwood testified that tires were sold at Dave's Standard during the period from August of 1976 through February of 1977, but continued:

"Q. And was Mr. McLaughlin present at that service station when they were sold?

"A. Well, I don't know whether he was or not. See, most of the salesmen worked in the daytime and Dave usually came in the evening or late afternoon.

"Q. And what was his capacity then? Dave McLaughlin's capacity?

"A. He was kind of a night time manager."

Greenwood described methods that were used to induce unwary purchasers to buy new shock absorbers, one of which was to squirt oil upon the seals and indicate to the customer that the shock was leaking.

There were a large number of shocks sold out of the Outpost Chevron, but they were out of purchased stock and there is no specific evidence of any fraudulent sale by anyone. The evidence in this regard is so vague, without mention of time, places and conditions under which sales were made that I can find no basis whatsoever for finding that McLaughlin was involved in or should have known about fraudulent practices with respect thereto.

With respect to fan clutches, the testimony again is vague and inconclusive. Greenwood testified that there were occasions when clutches were improperly removed from automobiles, another one sold to the car owner, and the old one sandblasted and put back in stock. He identified various clutches that had been seized at El Rancho Standard as having been either sandblasted, painted, or left in the original condition as removed from an automobile. He described the method of a fraudulent sale, either by squirting the seals, or if that could not be done, "they'd just wiggle it and have the customer start the car and they'd hold the fan clutch and it would make a screaming noise." A couple of times he had seen fan clutches that had actually failed but during 1978 they probably averaged one or two sales a day at Outpost Chevron. It is also true that invoices show that during his stay at that station in March of 1977, McLaughlin made two sales of fan clutches. However, there is no testimony indicating either that those were fraudulent or that the replacement clutches were not legitimate articles of commerce. There is no evidence concerning the inventory of new clutches on hand at the time McLaughlin made the sales.

This brings us to the matter of alternators. Here again, I refer to the testimony of Greenwood. Outpost Chevron appears to have done quite a business in these. Greenwood was unable to give the total that were sold but beginning with an original stock of five, two of which were bad and had to be replaced, and with no other purchases the station was able to sell from 7 to 10 alternators a day during the summer months. The

generally described method was for the salesmen (unnamed and with no specific reference to any time, place or incident) to squirt liquid barbeque smoke into the alternator which would make it smell as though the wires were burning up inside. After an alternator had been removed it would be sandblasted and returned to stock. Sandblasting was necessary to remove the barbeque smoke, as well as the regular dirt, grease and grime that had gotten on it.

A voluntary statement of McLaughlin, together with Greenwood's testimony, permitted the introduction in evidence of an invoice of Outpost Chevron dated July 24, 1978, showing the sale and installation of an alternator by McLaughlin. The invoice does not state, and the evidence does not otherwise show, whether the alternator sold was new, rebuilt or one that had been taken from another car and sandblasted. It was installed in a Chevrolet automobile. In re-cross-examination, Greenwood could not testify whether it was a good or bad alternator or where it came from because he was not there at the time. However, he also testified that the alternators shown by the invoices in evidence to have been sold (the record contains only one sales invoice for an alternator, the one dated July 24, 1978) came from his storeroom; that the alternators in the storeroom came off cars and had been sandblasted, and his final statement was that he had begun operations with five purchased alternators, replaced two of those, and that at the time of the sale by McLaughlin, "[a]s far as I know, there might have been a Chrysler alternator but I don't think we had a Chevrolet alternator left." The invoice shows that the alternator in question was put in a 1971 Chevrolet. Greenwood further testified that he did not have any "good—good in the sense that they were original, not non-recycled parts."

Greenwood was examined by defense counsel, without objection from the State, as to a statement that he had previously made in which he had indicated that the sale on July 24, 1978, was for a car that had been accompanied to the station by a highway patrolman, the lights on the car having failed. At the trial he confirmed that this was what he had been told. He was not there at the time.

At this stage of the inquiry, I find no reasonable basis upon which to conclude that McLaughlin himself was guilty of any dirty salesmanship. There is no evidence whatsoever connecting him with the sale of tires or shock absorbers. There is nothing to show that the fan clutch replacements he made in March of 1977 were not needed. There is no basis upon which to infer that his sale of an alternator on July 24, 1978 was not a legitimate sale, and the hearsay evidence clearly indicates that that alternator was needed. This conclusion does not warrant the further conclusion, however, that he might not have made those sales of fan clutches and an alternator, knowing that he was selling equipment which had been removed from other cars, sandblasted or painted and replaced in stock. As to the alternator, no inference is possible except that he sold an alternator which had been removed from another car and either sandblasted or painted. As I shall subsequently set forth, McLaughlin was experienced in sandblasting, so if the alternator had been sandblasted, he should have been able to recognize that fact. However, we cannot infer whether the alternator had been sandblasted or painted and we have no means of inferring that McLaughlin was familiar with this latter process. This is not an idle quibble because of the 13 alternators introduced in evidence that were taken from El Rancho Standard, eight had been sandblasted, three had been painted and two were new or rebuilt. This sale, then, still leaves unsettled the question of guilt.

However, I now refer to McLaughlin's activities in the field of sandblasting. His knowledge of this art is shown by a conversation he had with Greenwood:

"Q. ... What was that conversation?

"A. Well, we were talking about how the ceramic tips that those sand-blasters had on them would break so I ordered some metal tips so they wouldn't break. And we also discussed how to keep the sand out of our eyes.

"Q. Did he indicate to you at that time the actions he was taking to attempt to keep the sand out of his eyes?

"A. He had told me that he ordered a welder's hood. It's a leather cape that goes over your head with a shield in front.

\* \* \* \* \* \*

"Q. Was a sand-blaster or were sand-blasters used in Mr. McCracken's service stations?

"A. Yes, they were.

"Q. And did Mr. McLaughlin indicate to you that he had knowledge of the fact that they were being used?

"A. Yes, he did.

"Q. What were they used for, Mr. Greenwood?

"A. They were used for blasting used automobile parts.

"Q. Specifically, why were they blasted?

"A. They looked a lot better than being painted and you could sell them as new or rebuilt.

"Q. Specifically, what substance were you, or members of this operation sand-blasting off of the goods?

"A. Well, we were blasting barbeque smoke off of them and the regular dirt and grease and grime that gets on this.

"Q. How did the barbeque sauce [probably should be smoke] get on them?

"A. It was squirted in by the salesman.

\* \* \* \* \* \*

[On cross-examination]

"Q. These sand-blasters, State's Exhibits 13 and State's Exhibit Number 12, what are they used for?

"A. I don't have any idea what you'd use it for originally, but we used them to blast parts.

"Q. You can clean off parts with them?

"A. Yes, sir.

"Q. Clean off other metal objects?

"A. I would imagine, but it screws up pretty bad.

"Q. Do they have legitimate purposes as well as sand-blasting alternators?

"A. I would imagine they do.

"Q. How about the sand that goes in them?

"A. It's used for sand-blasters.

"Q. For whatever purpose?

"A. Yes, sir.

"Q. How about the shields?

"A. The welding?

"Q. That you cover your eyes with?

"A. Yes, sir, for grinding and for anything that a foreign object could get in your eyes.

"Q. And you could use it while you were using a sand-blaster or another piece of equipment, couldn't you?

"A. Yes, sir, a grinder or something like that.

\* \* \* \* \* \*

[On redirect]

"Q. Mr. Greenwood, on cross-examination you indicated that perhaps sand-blasters do have a legitimate use, whatever it may be. Did you ever see these sand-blasters used for anything excepting sand-blasting parts to be put on and sold as new parts?

"A. No, sir, I haven't.

"Q. All right. You testified on direct examination about a conversation you had with Mr. Dave McLaughlin about purchasing a shield; is that correct?

"A. Yes, sir, a welder's shield.

"Q. During the course of that conversation, did he tell you what that mask was going to be used for, specifically?

"A. Yes, sir, to try and keep the glass beads out of his eyes.

"Q. While he was doing what?

"A. Sand-blasting parts."

I must therefore conclude that the jury would have been justified in finding that sandblasters were an important tool in the successful and profitable operations unquestionably carried on at the Outpost Chevron and possibly at other stations operated by Dave McCracken; that while they might be used for legitimate purposes, the only pur-

pose for which they were used in the McCracken stations was to sandblast automobile parts, including fan clutches and alternators, so as to restore a good appearance; that McLaughlin knew that they were being used and the purpose thereof; and that he himself used them in the sandblasting of automobile parts.

Reverting to Judge Ely's statement of the applicable rule, that

"once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy,"

I am of the opinion that there is very strong evidence showing McLaughlin's connection, although slight—we do not know just how much sandblasting he did—with the conspiracy. I therefore concur in the conviction on that basis.